586 So.2d 1085 (1991)
Dennis FLANAGAN, Appellant,
v.
STATE of Florida, Appellee.
No. 87-871.
District Court of Appeal of Florida, First District.
July 19, 1991.
On Motion for Rehearing or to Certify Conflict or to Certify Question October 14, 1991.
*1087 Michael E. Allen, Public Defender, Kathleen Stover, Asst. Public Defender, for appellant.
Robert A. Butterworth, Atty. Gen., A.E. Pooser, IV and Gypsy Bailey, Asst. Attys. Gen., for appellee.
EN BANC
MINER, Judge.
Raising several issues, appellant, Dennis Flanagan, seeks review of his conviction and life sentence for sexually battering his mentally retarded 9 year old daughter. Specifically, he asserts: 1) the trial court erred in admitting a physician's testimony as to the identity of the child's sexual abuser pursuant to the medical diagnosis/treatment exception to the hearsay rule; 2) the trial court erred in allowing the jury to view videotaped testimony of the victim during its deliberations; 3) the trial court erred in admitting expert testimony regarding general characteristics of child sex abuse offenders and the home environments in which child sexual abuse frequently occurs; 4) the trial court erred in admitting similar fact evidence relating to a sexual act appellant committed on another child; and 5) the trial court erred in denying appellant's motion for a mistrial based upon improper prosecutorial comment and based upon certain testimony of a separately charged individual. For the reasons which follow, we affirm Flanagan's conviction and sentence.
The charges on which Flanagan was tried stemmed from incidents which, according to a state witness, occurred over a period of a year or more. The witness, Brenda Hartley Harrison, appellant's erst-while live-in girlfriend, testified that she met appellant in 1983 shortly before Christmas at a flea market in Albany, Georgia. At the time, she was 15 years old and he was 30. In January of 1984, she ran away with appellant, a married truck driver, and travelled to South Florida with side trips to Mississippi and Alabama. After about two months, she returned to her Albany home. Within a day or two of her return, appellant went to Albany to get her and the two of them returned to Wakulla County, Florida, where they moved into a home on his father's property where appellant's then wife, Peggy, was living. This housekeeping arrangement was apparently unacceptable to Peggy and she moved out after a day or two. Shortly thereafter, Flanagan and Brenda moved out of the home and *1088 into an older model Dodge van until a more suitable living place could be found.
By putting two small trailers together and building on, appellant and Brenda solved their housing problem. In June of 1985, Brenda, at age 16, gave birth to the couple's son and the following month appellant's two daughters from one of his prior marriages, T.F., 7 years old at the time and the victim in this case and C.F., the victim's 5 year old sister, moved in with them.
Brenda next testified that shortly after the children arrived, appellant stated to her that he was going to teach his daughters how to have sexual intercourse before they grew up and before they were "forced into it by someone else". According to Brenda, appellant decided to have sex with T.F. because C.F., although two years younger, was much more intelligent than T.F. and would be more likely to "go and tell" than would T.F.
His choice made, Dennis Flanagan, if Brenda's testimony be believed, on multiple occasions subjected his little girl to all manner of unspeakable sexual outrages, the detailing of which on these pages would add but little to the jurisprudence of this state. It is enough to say that the acts Brenda described would evoke in all but the most insensitive persons, feelings of shock and revulsion. From time to time, at appellant's direction, Brenda assisted him in these acts.[1] She recounted one occasion in which she held T.F.'s arm to steady the little girl while appellant was lying on his back engaged in intercourse with the child. Fear of appellant was the reason she gave for her participation.
After a false start or two, Brenda finally left appellant to go to her grandmother's home in Louisiana. However, before she left, she told appellant's former wife, Peggy Fulton, about appellant's sexual abuse of T.F. Together, she and Peggy told Imogene Whaley, a school bus driver on whose bus T.F. regularly rode from her home to Sopchoppy Elementary School and back. Mrs. Whaley advised Mr. Coyle, principal of Sopchoppy Elementary School, who, in turn, reported the matter to John Harper, a district intake counselor with the State Department of Health and Rehabilitative Services. (HRS).
On November 19, 1986, John Harper interviewed T.F. at school in the presence of Deborah Thibos, a guidance counselor at Sopchoppy Elementary School. After the child confirmed the report he had received, he notified law enforcement authorities and drove T.F. to Tallahassee for the purpose of conducting what is known as a "first strike" interview. This interview was videotaped,[2] after which the child was taken to Dr. James Penrod, a pediatrician member of the Tallahassee Child Protection Team for a medical examination.
Prior to his examination of T.F., Dr. Penrod was advised that the child had alleged that her father had sexually abused her. Upon entering the examination room, the doctor introduced himself and, because T.F. was a young child and "very reticent because of the situation", used what had been told to him about her allegations "as a basis for my role in questioning". He said: "I understand you have had some problems with your father. What has happened with your father?" T.F. answered: "He tried to stick me". As Dr. Penrod drew her out with further questioning, T.F. said that appellant had "tried to stick [his penis] in me" three or four times and that "he put Vaseline on it". She also denied that anyone else touched her or tried to stick anything in her.
Dr. Penrod next testified as to the results of his physical examination of T.F. He found in this pre-pubital youngster an abnormally enlarged vaginal opening, a wholly relaxed vaginal muscle and no remnant of a hymeneal membrane. He described *1089 the sum of these findings as highly unusual in a child so young and as being consistent with repeated vaginal penetrations.
A few days after Dr. Penrod examined T.F., she was taken to Dr. Evelyn Goslin, a child psychologist and an expert in child sexual abuse for evaluation and an assessment of whether or not T.F. had been traumatized and to make recommendations as to a course of treatment. During this evaluation, Dr. Goslin did not mention anything of a sexual nature to T.F. and the child volunteered nothing about her earlier allegations. After her interview with Dr. Goslin, T.F. and her younger sister, then in the custody of H.R.S., were returned to a shelter for abused children. Thereafter, they were placed with their paternal grandparents.
When law enforcement officers sought to arrest appellant on the instant charges, he was out of the area in connection with his truck driving occupation. Apparently, during this or perhaps an earlier trip, he had made the acquaintance of another young woman, Brenda Lutz, a waitress at a truck stop he frequented. He asked her to marry him, she accepted, and the two of them eventually began living together somewhere in the Ocala, Florida area.
According to Brenda Lutz's trial testimony, while on their way to purchase an engagement ring for her, appellant, who was driving a truck owned by Sprayberry Trucking Company of Tallahassee, stopped at a roadside telephone booth to call his father in Wakulla County on some matter. At that time, he learned that officers were looking for him in connection with sexual abuse charges involving his daughter. He completed the call and then told Brenda about the charges "up in Tallahassee". The following day, appellant and Brenda Lutz drove to Tallahassee in the Sprayberry truck and picked up his van at the truck yard. From there, appellant went to consult with an attorney after which he and Brenda left in a Sprayberry truck for Virginia.
Upon their return from Virginia, appellant again called his father, this time from Wildwood, Florida. After the call, he told Brenda that they needed to "get out of there quickly". They returned to Ocala and rented a trailer. After writing to his employer to advise where it could be found, appellant drove the Sprayberry truck to the Spur truckstop in Ocala and abandoned it. In this letter, appellant told his employer that by the time "they got the letter, that he would be out of state".
Using the name Brent Lutz and Brenda's Social Security number, appellant soon found a job in the Ocala area.[3] He was, however, without transportation as Brenda's car was not operable. This necessitated his return to the Tallahassee area to pick up his van. When he got to the home of a friend who was keeping the van for him, law officers arrived at the friend's home. He escaped capture at that time by having his friend lock him in the trunk of the friend's car while the friend's wife drove appellant's van to a rendezvous point outside Tallahassee. There, appellant got into his van and returned to Ocala. Shortly thereafter, on a tip from Brenda Lutz, appellant was arrested at his place of employment on the instant charges by a Marion County deputy sheriff. Upon his arrest he denied his true identity in the face of mounting evidence to the contrary and only admitted he was Flanagan when booked at the Marion County Jail.
In addition to the substantive testimony at trial of Drs. Penrod and Goslin, T.F., John Harper, Ms. Thibos, Brenda Harrison and Brenda Lutz, V.L., a child 11 years old at the time of the events she described, testified over defense objection that during the time period in question, she lived in a house next door to appellant and was a frequent visitor in appellant's home. She recounted one occasion when she was visiting *1090 appellant's home overnight. She was "trying to go to sleep on the couch" when Brenda Harrison called her into the bedroom where appellant was laying on his back on the bed, unclothed. She testified that Brenda "picked me up and put me on top of him and said, `this is how you ride a horsey'." Brenda, she said, was holding her by her waist on appellant's lower abdomen and appellant was "moaning and groaning". When asked by the prosecutor "Did anything hurt you that night?", she answered, "My private."
After final arguments of counsel and instructions on the law by the court, the prosecutor stated: "Judge, one other matter. There is the T.V. and the VCR. Can we have someone set them up in the jury room?" The trial court then instructed the jury: "  if you wish that to be setup for you, if it's necessary to do so, would you please tell the Bailiff, where both the attorneys and the court can be there to see that it is placed in there. O.K." Immediately thereafter, the jury left the courtroom to begin its deliberations.
Dennis Flanagan was convicted of one count of sexual battery on T.F., acquitted on another count and thereafter adjudicated and sentenced. The instant appeal then ensued.
Because we find that the first and third points raised by appellant dealing with the testimony of Drs. Penrod and Goslin warrant the most extensive analysis, we deal first with his other allegations of reversible error beginning with his contention that the trial court erred in permitting the jury's apparent unsupervised viewing of the victim's videotaped testimony during its deliberations.
So far as we have been able to determine, no appellate court in Florida has yet reached this question although the issue was raised in Chambers v. State, 504 So.2d 476 (Fla. 1st DCA 1987). In Chambers, however, the court found the issue was not preserved for appellate review in that defense counsel failed to object when the jury requested to view the videotape in question.
While not yet specifically addressed by a Florida court, courts in other states have ruled on this issue. In Martin v. State, 747 P.2d 316 (Ct.Crim.App.Ok. 1987), the Oklahoma court held that a videotape of a child's testimony could not be submitted to the jury for its unrestricted and repeated viewing during jury deliberations. The court noted that although the Oklahoma statute permitted the jury, after having retired, to make a request to again hear certain testimony, videotaped testimony of a child witness was distinguishable from a dispassionate reading of trial testimony to the jury. The court stated that the risk of prejudice was great in this situation. In Chambers v. State, 726 P.2d 1269 (Wy. 1986), the court construed a statute allowing the jury to request additional information and found that the statute did not change the common law rule against submitting testimony or materials to the jury for unsupervised and unrestricted review during deliberations, and did not permit trial courts to repeat large amounts of testimony just because the jury made such a request. The court stated that the trial court, instead, should isolate the precise testimony which can solve it (the problem raised by the jury), and weigh the probative value of the testimony against the danger of undue emphasis. Chambers at 1276.
In Taylor v. State, 727 P.2d 274 (Wy. 1986), the court found that permitting the jury to view videotaped testimony of a 3 year old sexual abuse victim was prejudicial error where the trial court did not supervise the viewing of the videotape, did not inquire as to why jurors wanted to view the videotape and did not determine specific facts sought by the jury. In Taylor, the only evidence supporting the conviction was the young child's testimony. See also Schmunk v. State, 714 P.2d 724 (Wy. 1986); State v. Fried, 92 N.M. 202, 585 P.2d 647 (Ct.App.), cert. denied, 92 N.M. 260, 586 P.2d 1089 (1978); 585 P.2d 647 (Ct.App. New Mexico 1978); and United States v. Binder, 769 F.2d 595 (9th Cir.1985) cert. denied, 484 U.S. 1073, 108 S.Ct. 1044, 98 L.Ed.2d 1007 (1988). In Binder, the court found that allowing the jury to see and *1091 hear the child victim's videotaped testimony a second time in the jury room during deliberations unduly emphasized such testimony. Again, in Binder, the only evidence of criminal acts was presented through the videotaped testimony.
Appellant's argument on this point is necessarily predicated on certain assumptions: 1) that the cartridge encased videotape in question was in the jury room during deliberations; 2) that a television set and a VCR, without which the videotape could not be viewed, were taken to the jury room during deliberations; 3) that the jury actually viewed the videotape in question during deliberations; and 4) that the jury's viewing of the videotape was unsupervised. We find that the only assumption that finds any support whatever in the record is assumption number 1.[4] Indeed, the trial court specifically instructed the jury immediately before deliberations began that only upon request would the T.V. set and the VCR be taken into the jury room and then only under the watchful eye of the court and counsel. For us to conclude on the record before us, as has appellant, that the apparatus absolutely necessary to view the videotape in question was, in fact, set up in the jury room, that the jury, in fact, viewed the videotape during deliberations and that such viewing was unsupervised and unrestricted, is to give full sway to surmise and conjecture and substitute speculation for record support.
We observe that in all of the cases from other jurisdictions cited above, the jury actually viewed the videotaped testimony during deliberations. An analysis of these cases reflects the courts' concern that to permit unrestricted, unsupervised viewing of the videotaped testimony in the jury room might result in undue emphasis being placed on such testimony to the prejudice of the accused, particularly where that testimony constituted the only evidence of guilt.
Because the facts of the case at hand do not require us to decide whether or under what circumstances a jury may be permitted to view videotaped testimony during its deliberations, we leave that question to abide another day in an appropriate case. However, so that an accused person may not be unfairly prejudiced in this regard, we urge informed caution when such questions arise and commend to the bench and bar such guidance as the cited cases provide.
Here, the only thing the record reflects is that the video cassette containing T.F.'s "first strike" interview testimony may have found its way to the jury room along with other evidentiary exhibits. Assuming that such was the case and that the presence of this videotape in the jury room was unauthorized, we find a recent Florida Supreme Court case to be instructive and supportive of the position we take on this point. In State v. Hamilton, 574 So.2d 124 (Fla. 1991), the supreme court was called upon to decide whether the recommendation of a jury in the penalty phase of a capital case must be set aside because of unauthorized publications present in the jury room during deliberation. In applying the harmless error standard set forth in State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), the court stated:
"Our courts have applied a harmless error analysis that requires close scrutiny of the type of unauthorized material at issue, its relation to the issues at trial and the extent to which jurors actually consulted the material ..." (Emphasis added).
The mere presence of the videotape in the jury room without a record showing of "the extent to which jurors actually consulted the material" persuades us and we hold that there was no reasonable possibility that the video cassette in the jury room affected the jury's verdict in this case. DiGuilio; *1092 Paz v. United States, 473 F.2d 662 (5th Cir.), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 52 (1973); United States v. Howard, 506 F.2d 865 (5th Cir.1975).
Flanagan next argues that the trial court erred in admitting so-called Williams Rule testimony of an incident of sexual abuse committed by appellant on the child, V.L. However, we find that the similar fact testimony of V.L. in this case was clearly relevant to prove a material fact in issue  motive or intent, as required by Section 90.404(2)(a), Florida Statutes (1985). Gibbs v. State, 394 So.2d 231, 232 (Fla. 1st DCA), aff'd., 406 So.2d 1113 (Fla. 1981) (existence of a lustful attitude towards stepdaughter, proven by prior sexual assaults, makes it more likely or probable that the defendant possessed the same state of mind on the date of the offense); Potts v. State, 427 So.2d 822 (Fla. 2d DCA), rev. den., 434 So.2d 888 (Fla. 1983). See also cases cited in E. Cleary, McCormick on Evidence, Sec. 190, at 560-61 and Supp. at 59 (3d ed. 1984 and Supp. 1987). Thus, the testimony of V.L. was properly admitted as similar fact evidence showing a unique characteristic or combination of characteristics.
Likewise, we do not agree with appellant's argument regarding the Supreme Court's holding in Heuring v. State, 513 So.2d 122 (Fla. 1987). In Heuring, the court reversed the defendant's conviction because evidence of the defendant's molestations of children other than his stepdaughter and daughter was improperly admitted. Appellant argues that Heuring stands for the proposition that the rule permitting similar fact evidence in cases involving sexual battery upon children is limited to only illicit sex between family members. However, in our view, the court in Heuring simply held that the evidence of extra-familial molestations, as presented, was not sufficiently similar to the charged offenses. In the instant case, the trial court found that there was sufficient similarity between the sexual battery of 11 year old neighbor child V.L. and the offense against T.F. We find no error in this ruling and affirm on this point.
Regarding appellant's argument that the trial court erred in denying his motions for mistrial, we similarly find no error. Appellant's trial counsel first moved for a mistrial after the prosecutor told the jury during his opening statements: "You are going to find that Brenda (Harrison) has entered pleas to six felonies and is awaiting sentencing." The trial court overruled the objection but did not rule on the motion for a mistrial. Appellant's failure to secure a ruling on the motion may be considered a waiver and the issue therefore has not been preserved for appellate review. See Leretilley v. Harris, 354 So.2d 1213 (Fla. 4th DCA), cert. den., 359 So.2d 1216 (Fla. 1978).
Appellant also moved for a mistrial following Brenda Harrison's testimony that appellant "had made promises that he would never mess with any more kids." The trial court denied the motion and permitted the state to re-examine Brenda Harrison as to why she returned to appellant after having left him. She corrected her response to say, "Because he had promised that he would not hurt (T.F.) any more and that things would get better, be better." In addition to the arguable nature of the words first used by the witness, appellant did not request a curative instruction as to that response. We consider such a request to be a necessary prerequisite for a motion for mistrial. Ferguson v. State, 417 So.2d 639, 641 (Fla. 1982); Palmer v. State, 486 So.2d 22, 23 (Fla. 1st DCA 1986). Accordingly, we find no merit to appellant's arguments on this point.
A pivotal point in this appeal is appellant's contention that the trial court erred in permitting Dr. James Penrod to testify that T.F. identified appellant as her sexual abuser. Such testimony, argues appellant, is inadmissible hearsay in that the child's ascription of fault and identity are not, as required by Section 90.803(4) of the Florida Evidence Code, reasonably pertinent to diagnosis or treatment of the condition she presented when examined by the doctor. For any one of three reasons, we find appellant's *1093 argument on this point to be without merit.
First, under the facts of the case, we are not persuaded that T.F.'s statement to Dr. Penrod was hearsay at all.[5] Section 90.801(2)(b) provides that a statement is not hearsay 1) if the declarant testifies at trial; 2) is subject to cross-examination concerning the statement; and 3) the statement is consistent with his testimony and is offered to rebut an express or implied charge against him of improper influence, motive or recent fabrication. (Emphasis added). At trial, T.F. testified on direct examination that appellant was her abuser, which testimony was consistent with her earlier statements to John Harper, Deborah Thibos and Dr. Penrod.[6] However, on cross-examination, appellant's counsel elicited from the child that she had told Dr. Goslin only a few days before trial that Brenda Harrison rather than appellant had "hurt" her.[7] Given that T.F. had only a minute or two earlier on direct examination once again identified appellant as her assailant, defense counsel's cross-examination of the little girl impliedly, at least, suggested that her direct testimony on the identity of her abuser was either the product of improper influence exerted on her by some person or persons or amounted to a recent fabrication. Consequently, on the record before us, the objected to testimony was, by definition, not hearsay in that T.F., the declarant, testified at trial and was subject to cross examination regarding the statement; the statement itself was consistent with her testimony on direct examination; and it was admissible to rebut the inference(s) raised by defense counsel's cross examination.
Even were we to conclude that Dr. Penrod's recounting of what T.F. told him with regard to appellant was hearsay, we would nonetheless hold such testimony to be admissible under the medical diagnosis and treatment exception to the Florida hearsay rule.[8] In so holding, we would align this court with the clear trend of authority which admits identifying statements in child sexual abuse prosecutions. The rationale for such admission is that, within the context of incidents of child sexual abuse occurring in the home, for treatment purposes statements of identification are inseparable from other statements regarding the incident. See Graham, The Confrontation Clause, the Hearsay Rule and Child Sexual Abuse Prosecutions: The State of the Relationship, 72 Minn.L.Rev. 523, 529 (1988); McCormick on Evidence, Sec. 297 (3d Ed. 1984).[9]
Florida's diagnosis and treatment exception to the hearsay rule is patterned after the federal exception contained in Rule 803(4) of the Federal Rules of Evidence, which provides:

*1094 Statements made for the purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
Although the Florida rule is worded somewhat differently, we believe the distinction between the two rules on the issue before us is of no legal moment and that the Florida rule should be construed in accordance with federal decisions interpreting the federal rule. See Moore v. State, 452 So.2d 559 (Fla. 1984). See also C. Ehrhardt, Florida Evidence, § 803, at 467 (2d Ed. 1984) ("the exceptions contained in Section 90.803 are similar to those enumerated in Federal Rule of Evidence 803").
With respect to the medical hearsay identity issue, the leading case supporting the position we take is United States v. Renville, 779 F.2d 430 (8th Cir.1985). There, the court approved the trial court's admission of certain statements identifying the defendant as the abuser of the child, which statements the child had made to a physician during a medical examination. In so ruling, the Eighth Circuit observed that a statement by a child sexual abuse victim identifying the abuser as a member of the child's immediate household would be generally admissible because such statements are the type that physicians reasonably rely upon in determining a diagnosis and/or course of treatment. 779 F.2d at p. 438. The court reasoned:
First, the child abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime. The exact nature and extent of the psychological problems which ensue from child abuse often depends on the identity of the abuser.
The Renville court concluded that because of the emotional and psychological component presented in sexual abuse of children at home, such cases were "wholly different" than those in which the injury complained of is "purely somatic." In cases of the latter type, the general rule banning statements of fault was applicable because no facet of the treatment involved could relate to the identity of the individual at fault or prevent recurrence of the injury. In a word, in "purely somatic" injury cases, statements of fault or identity may be irrelevant to diagnosis or treatment and thus do not qualify for admission under the diagnosis and treatment exception to the hearsay rule.
In United States v. Provost, 875 F.2d 172 (8th Cir.), cert. denied, 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989), the court applied the Renville rationale not only to statements made by a victim to her treating psychologist, but also to her examining physician. See also United States v. Shaw, 824 F.2d 601, 608 (8th Cir.1987), cert. denied, 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988).
Courts in a number of states, some with more restrictive medical diagnosis hearsay exceptions than the federal exception, have held that statements such as the one in the case at hand are admissible. For example, in People v. Wilkins, 134 Mich. App. 39, 349 N.W.2d 815 (1984), the defendant was convicted of committing first degree criminal sexual conduct with his 9 year old stepdaughter. A hospital emergency room doctor and an official of the County Department of Protective Services for Children referred the victim to a physician, the director of the Family Assessment Clinic. During her examination of the victim, the victim identified the defendant as her assailant. At trial, the physician testified to this statement.
On appeal, the appellant argued that the statement should not have been admitted under the medical diagnosis hearsay exception because it was not reasonably necessary to medical diagnosis or treatment, not that it was not made for the purpose of medical diagnosis or treatment. The appellate court noted that there were no Michigan cases on point so it looked to the federal rule. While the court observed that the federal exception was broader because it only restricted the exception to statements that were reasonably pertinent *1095 to diagnosis or treatment, it still held that the victim's statement was properly admitted into evidence. Other state courts have modeled their approaches in such cases after Renville, focusing on the child, child sexual abuse context and prevention of child sexual abuse in their decisions. For example, in State v. Nelson, 138 Wis.2d 418, 406 N.W.2d 385 (1987), the state charged the defendant with one count of intentionally and feloniously having sexual contact with his daughter who was approximately 3 years old. At trial, the state presented no eyewitness testimony and did not call the victim to testify. Instead, the state presented evidence of the assault and the victim's link to the assault through the testimony of the victim's mother, the victim's treating psychologist, and another psychologist. Specifically, the treating psychologist testified that during some of the numerous sessions he had with the victim, she implicated her father. The other psychologist also testified that, during several sessions with the child, she had implicated her father.
The Wisconsin Supreme Court first determined that the victim's statements were made with the knowledge that they were to be used as a basis for diagnosis and treatment, and then embarked on a discussion concerning the propriety of the trial court's admission of the victim's statements as to whom her abuser was.
The general rule is the statements as to who was at fault are ordinarily inadmissible under the exception for statements made for the purpose of diagnosis or treatment. The reason behind this rule is that statements identifying the assailant seldom are made to promote effective treatment.
However, while treatment of a physical injury would rarely require disclosure of the identity of the assailant, it is recognized that disclosure of the identity of the assailant is reasonably necessary to provide treatment for a victim of child abuse. Child abuse cases often involve emotional and psychological injuries as well as a physical injury. Treatment of these emotional and psychological injuries of a child abuse victim often depends upon the identity of the abuser.
See also State v. Maldonado, 13 Conn. App. 368, 536 A.2d 600 (Ct.App.), cert. denied 207 Conn. 808, 541 A.2d 1239 (1988) (the court held that statements made by the victim, which identified the defendant as her assailant to a security guard at the hospital were admissible); State v. Vosika, 83 Or. App. 298, 731 P.2d 449, on reconsideration, 85 Or. App. 148, 735 P.2d 1273 (1987) (the court reasoned that, from the perspective of the foster mother, social worker, and pediatrician, the victim's statements regarding the identity of her abuser were essential to correctly treat the child); State v. Bullock, 320 N.C. 780, 360 S.E.2d 689 (1987) (the court held admissible the victim's statements to a pediatrician/child medical examiner concerning the identity of her abuser); State v. Smith, 315 N.C. 76, 337 S.E.2d 833 (1985) (the court held that the statements of one of the victims to her grandmother concerning the identity of the defendant as the perpetrator of the crime were admissible); State v. Gregory, 78 N.C. App. 565, 338 S.E.2d 110 (1985) (the court held that statements by the victim to her grandmother were admissible based upon Smith).
In State v. Robinson, 153 Ariz. 191, 735 P.2d 801 (1987), the state charged the defendant with having improper sexual contact with his stepdaughter and another child both of whom were under 12 years of age. At trial, the psychologist of one of the victims testified, relating that the victim told her that the defendant had kissed her and placed his penis in her "privates" and in her mouth. The Arizona Supreme Court found these statements were properly admitted into evidence under the medical diagnosis/treatment hearsay exception. The court held:
 the identity of the victim's assailant and other statements attributing fault ordinarily are inadmissible under Rule 803(4) because because identity and fault usually are not relevant to diagnosis or treatment... .
This general rule, however, is inapplicable in many child sexual abuse cases *1096 because the abuser's identity is critical to effective diagnosis and treatment.
* * * * * *
At least in child sexual abuse cases, we therefore join the growing number of jurisdictions which recognize that statements regarding the abuser's identity fall within Rule 803(4) whenever, as here, identity is relevant to proper diagnosis and treatment. When the abuser's identity is elicited and given to further treatment, the doctor's and the declarant's "selfish interest[s]" in giving and obtaining proper treatment are a sufficient guarantee of trustworthiness to at least allow the jury to evaluate the statements.
In State v. Aguallo, 318 N.C. 590, 350 S.E.2d 76 (1986), the defendant was indicted on a charge of first degree rape for engaging in vaginal intercourse with his 9 year-old stepdaughter. Subsequently, a pediatrician in the child medical examiner program examined the victim who related that the defendant was the perpetrator. On appeal, the defendant argued that the victim's statements in this regard were not made for the purpose of medical diagnosis or treatment but for the purpose of gathering evidence for the state. The North Carolina Supreme Court disagreed, noting that there was no evidence that law enforcement officials initiated the visit. Specifically, the social worker took the victim to the doctor several months before trial. On this basis, the court distinguished its decision in State v. Stafford, 317 N.C. 568, 346 S.E.2d 463 (1986), where the physical examination of the victim took place just three days before trial "to prepare and present the state's rape trauma syndrome theory at trial." The Aguallo court concluded that the victim's identification statements were reasonably related to treatment and diagnosis and thus were properly admitted into evidence. See also Stallnacker v. State, 19 Ark. App. 9, 715 S.W.2d 883 (1986); Goldade v. State, 674 P.2d 721 (Wyo. 1983).
In contending for the application of the minority view in resolving this issue, appellant calls our attention to such cases as Torres-Arboledo v. State, 524 So.2d 403 (Fla.) cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988), Bradley v. State, 546 So.2d 445 (Fla. 1st DCA 1989) and Hanson v. State, 508 So.2d 780 (Fla. 4th DCA 1987). We find each of these cases to be factually distinguishable or otherwise inapposite.
In Torres-Arboledo, the Florida Supreme Court held that the victim's statements to an emergency room doctor were not admissible under the medical diagnosis/treatment exception. Specifically, the victim told the doctor that "A couple of black people tried to steal his medal and shot him." The court's observation that "so-called statements of fault do not qualify" for admission under the medical diagnosis/treatment hearsay exception expresses the traditional view of the matter where, as in that case, the statement objected to clearly had no relevance to medical diagnosis or treatment for any condition presented. We do not, however, interpret the language quoted above to be a blanket prohibition to the admissibility of statements of fault or identity in all situations. Otherwise stated, we are not persuaded that the supreme court, by dictum, intended to limit consideration by a jury of relevant evidence admitted under this exception.
Indeed, in Danzy v. State, 553 So.2d 380 (Fla. 1st DCA 1989), this court affirmed the admission under the diagnosis/treatment exception of testimony of a doctor and nurse as to a sexual battery victim's statements recounting the assault and naming her assailant even though the victim had initially consulted the doctor for back and neck injuries.
In Danzy, the victim, a woman in her mid-twenties, was living with her sister and appellant (her sister's boyfriend) while she recuperated from injuries to her back and neck sustained in an auto accident. Shortly after she moved in, the appellant placed his hand inappropriately on her groin area, fondled her breasts and digitally penetrated her rectum. She ran out the front door of the apartment, tripped on the stairway and fell, re-injuring her back and neck.
After her re-injury, the victim returned to the same clinic at which she had previously *1097 been treated for her auto accident injuries. There, she saw a doctor other than the one who had initially treated her. He asked her how she had been re-injured. At first, she would say only that she had fallen down a flight of stairs. Noting her increasing agitation and feeling it important to learn why she was so upset and how she had fallen, the doctor persisted with his questioning. Finally, the victim told him of the incident preceding her fall and identified her assailant. She was then sent to the hospital for a sexual assault examination. While there, she told the nurse, who testified as to such statement at trial, that she had been sexually battered. In sustaining the trial court's admission of the testimony in question, the court reasoned:
The appellant argues that because the victim consulted the doctor for her back and neck injury, her statement concerning the sexual battery was irrelevant for treatment or diagnosis of that condition. While it is true that the victim went to the doctor initially for examination of her back and neck following her fall, the trial court did not err in finding that her statement describing the sexual battery is nonetheless admissible as "reasonably pertinent" to diagnosis or treatment of the victim's general condition. In so ruling, the trial judge evidently found, as we do also, that this statement is reasonably pertinent because the doctor himself felt it necessary to inquire how the victim aggravated her injury and why she was so visibly upset. The doctor specifically testified that he believed it was important to find out why his patient was in obvious distress. By the same token, the statement to the nurse at the emergency room was made to assist a medical examination.
Danzy, 553 So.2d at 381. (Emphasis supplied).
Aside from its departure from rigid adherence to the generalized traditional view, Danzy is instructive for a number of reasons. First, it addresses admissibility of evidence offered to describe cause or inception of injury in terms of its reasonable pertinence to diagnosis or treatment of the declarant's "general condition". Second, it stresses, and we believe rightly so, that what is "reasonably pertinent" to diagnosis and/or treatment is properly viewed from the perspective of the examining physician rather than the vantage point of an appellate court. Thirdly, as did Professor Graham in his treatise previously cited, it implicitly recognizes the practical improbability if not impossibility of separating the "what happened?" from the "who caused what happened?" in describing incidents of sexual assault.
We do not cite Danzy for the general proposition that in all sexual abuse prosecutions, statements of identity or fault will be admitted under the exception as being reasonably pertinent to diagnosis or treatment. We simply observe that, to be admissible under the exception, statements of fault or identity must rest on a proper predicate and be found by the trial court to be reasonably pertinent to diagnosis or treatment. There are, however, inescapable similarities between Danzy and the instant case. Both cases involved sexual abuse occurring in the home at the hand of one who lived there. Although the victim in Danzy was a mature woman in her mid-twenties and the victim in the instant case was a child of tender years, the examining physician in each case expressed concern regarding the emotional and psychological state of the victim. In each case, the trial court evaluated the statement offered and found it to be reasonably pertinent to diagnosis and treatment. In both cases, the appellant invited this court, through the exercise of hindsight and a considerable period of time after the fact, to decide what the examining physician needed to know or whether he needed to know what he thought he needed to know in arriving at a diagnosis or prescribing an appropriate treatment regimen. As did the Danzy court, we likewise decline the invitation and, in so doing, note that the standard of appellate review of a trial court's admission of such evidence is whether the trial court abused its discretion in admitting the evidence. Here we find no such abuse of discretion.
*1098 Our attention has also been called to Bradley v. State, 546 So.2d 445 (Fla. 1st DCA 1989), wherein a panel of this court held that a statement made by a person seeking confirmation of her suspicion of pregnancy to a nurse at a family planning clinic was not admissible under the medical diagnosis/treatment exception to the hearsay rule. There, the victim realized, about one month after a sexual assault by the defendant, that her menstrual cycle had been interrupted. Only then did she tell her mother of the assault. The victim and her mother visited a family planning clinic for a physical exam and a pregnancy test. While there, she told a staff member that she had been raped about one month previously, a fact which was entered onto the victim's health history form. At trial, the supervisor of the clinic testified regarding this entry.
This court held that such a "statement" did not fit within the medical diagnosis hearsay exception, because the victim did not visit the clinic to receive treatment for injuries due to assault or rape. Because she visited the clinic specifically for a pregnancy test, the court reasoned that a statement that the victim was raped was not shown of record to be reasonably pertinent to this determination. Thus, we find Bradley to be inapposite because, in the present case, the victim visited Dr. Penrod as a direct result of appellant's sexual assault on her.
Appellant also relies on Hanson v. State, 508 So.2d 780 (Fla. 4th DCA 1987). There, the court found erroneous the admission of the victim's statements to the examining physician that the defendant had had sexual intercourse with her. However, in Hanson, the defendant had no connection with the victim's household, a fact in and of itself which may have militated in favor of the conclusion reached there. See Morgan v. Foretich, 846 F.2d 941 (4th Cir.1988).
Even if our reasoning that Dr. Penrod's testimony regarding T.F.'s identification of appellant as her abuser was not hearsay under the circumstances is flawed, or our conclusion that even if hearsay, it qualified for admission under Florida's medical diagnosis/treatment hearsay exception is erroneous, that portion of Dr. Penrod's testimony would still not be a basis for reversal under the rationale of Salter v. State, 500 So.2d 184 (Fla. 1st DCA 1986), described in Kopko v. State, 577 So.2d 956 (Fla. 5th DCA 1991) as reflective "of the overwhelming view that cumulative or repetitive evidence cannot be harmful error."
In Salter, the counselor on the child protection team testified that the child victim told her that a man had touched her on her private parts. This court held that even if such admission was error, it was harmless:
An error in admitting testimony is harmless when substantially the same evidence was presented to the jury through the testimony of other witnesses. Palmes v. State, 397 So.2d 648, 653 (Fla. 1981), and Begley v. State, 483 So.2d 70 [(Fla. 4th DCA 1986)]. Here, the child testified concerning the lewd and lascivious assault by the appellant, and her mother and friend testified that immediately after the incident, the child reported the assault to them. Accordingly, we conclude that the testimony of the Child Protection Team counselor was merely cumulative and did not give significant additional weight to the child's testimony. Id.

See also Coy v. Iowa, 487 U.S. 1012, 108 S.Ct 2798, 101 L.Ed.2d 857 (1988); Woodfin v. State, 553 So.2d 1355 (Fla. 4th DCA 1989), rev. den., 563 So.2d 635 (Fla. 1990); Cook v. State, 531 So.2d 1369, 1371 (Fla. 1st DCA 1988), cert. denied, 489 U.S. 1084, 109 S.Ct. 1542, 103 L.Ed.2d 846 (1989); Westley v. State, 416 So.2d 18 (Fla. 1st DCA 1982); Fern v. Krantz, 351 So.2d 1144 (Fla. 3rd DCA 1977); Perkins v. State, 779 S.W.2d 918 (Tex. App. 1989); State v. Green, 603 S.W.2d 50 (Mo. App. 1980).
In this case, T.F. testified in person and on videotape. John Harper and Deborah Thibos testified, without objection, that T.F. told them her father was her sexual abuser. Brenda Harrison testified that appellant, sometimes with her assistance, sexually abused T.F. Dr. Penrod's unobjected *1099 to testimony established beyond peradventure that the condition of the child's private parts was consistent with repeated penetration. Important to note, also, is the fact that appellant has never contended that T.F. was not sexually abused. The thrust of his defense below was that he did not commit sexual abuse on her. Thus, as T.F.'s identification of appellant as her assailant was placed before the jury by other witnesses in addition to Dr. Penrod, we find there is no reasonable possibility that the admission of the doctor's testimony impermissibly influenced the jury's verdict. Any error in its admission was therefore harmless. DiGuilio, supra.
Before we leave this point, we believe it appropriate to address the role of the physician as a member of the Child Protection Team (CPT). We do so because of some suggestion that the physician, in carrying out his responsibilities as a team member, primarily serves a police function, i.e. investigating a crime as an agent for the state. As did the North Carolina Supreme Court in State v. Aguallo, supra, and this court in Gresh v. State, 560 So.2d 1266 (Fla. 1st DCA 1990), we reject this argument as being inconsistent with legislative intent, clearly expressed, that a CPT physician's examination shall serve to produce a diagnosis and a plan of treatment for child sex abuse victims. See generally Secs. 415.502, 415.503, 415.504 and 415.5055, Fla. Stat.
Nothing in the record before us suggests that law enforcement officers initiated Dr. Penrod's examination of T.F. or that her visit to Dr. Penrod was to prepare her to give testimony at trial. See State v. Stafford, 317 N.C. 568, 346 S.E.2d 463 (1986). Indeed, the record unequivocally shows that John Harper, an intake officer with HRS, received a referral concerning an alleged sexual abuse of the victim by her father. Based on an interview with the child, Harper took the little girl to Dr. Penrod. Nothing in the record even remotely hints that the visit by T.F. to Dr. Penrod's office was for any purpose other than diagnosis and treatment if she had been sexually assaulted. We thus conclude that in examining T.F., Dr. Penrod acted in the role contemplated by the Florida legislature in Chapter 415, i.e. as medical examiner and evaluator for the CPT rather than as a criminal investigator for some law enforcement agency.
We now turn our attention to appellant's last issue on appeal. Simply stated, he contends that the trial court committed reversible error in permitting Dr. Evelyn Goslin, an acknowledged expert in the areas of child psychology and child sexual abuse to testify in limited fashion about results of studies which identify certain shared characteristics of persons who commit child sexual abuse and the home settings in which child sexual abuse frequently occurs.
With respect to the so-called "offender profile" portion of Dr. Goslin's testimony, our review of the record reflects that it consumed but 2 of some 46 pages of her testimony. Once elicited, such testimony was never again mentioned during the trial. When Dr. Goslin was asked by the prosecutor whether her offender profile testimony meant that a person who possessed one or more of the characteristics she described was necessarily a child abuser, she replied in the negative, thus qualifying her description of the studies referred to as not useful in proving or disproving that one was or was not a child abuser.[10] In this regard, Dr. Goslin's observations are consistent with the present state of the law in this country that "offender profile syndrome" has not yet seasoned or been refined to the point where it commands substantial support in the scientific community as substantive evidence that one who possesses one, some, or all of the syndrome characteristics is, in fact, an abuser. Otherwise stated, at present, the use of offender profile testimony is not admissible as *1100 substantive evidence to prove the guilt of one charged with child sexual abuse.
On whether scientific acceptance of such testimony will come in the future, thereby meeting the exacting standards first laid down in Frye v. United States, 293 F. 1013 (D.C. Cir.1923) and thereafter followed in numerous cases, we need not speculate. Nor, within the context of this appeal, need we attempt a definitive determination of the validity of the studies describing this syndrome or their relevance to any defense raised by the appellant. Such is the case for two reasons. First, we are not persuaded that the testimony in question, described by Dr. Goslin as providing "background information" which is a "standard focus" of "almost every study", is inadmissible to promote juror understanding of a phenomenon which is "not so understandable that people know as much about it as a qualified expert with the requisite skill and exposure to numerous studies in the field." Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988). See also Kruse v. State, 483 So.2d 1383 (Fla.App. 4th DCA 1986), cause dismissed, 507 So.2d 588 (Fla. 1987) and Johnson v. State, 393 So.2d 1069 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).
Secondly, we conclude that even if the trial court abused its discretion in admitting the objected-to testimony, such error, under the facts of this case, was harmless and does not require reversal of appellant's conviction. Dr. Goslin expressly advised the jury that she was not offering the testimony as proof of appellant's guilt. The evidence adduced was isolated, brief and was not made a feature of the trial or referred to in any way during other testimony or in argument of counsel. Moreover, independent of the so-called profile evidence, sufficient other evidence, much of which was not objected to, was placed before the jury to support appellant's conviction. Indeed, the totality of the evidence adduced below persuades us that there is no reasonable possibility that the jury based its verdict solely on Dr. Goslin's offender profile evidence. DiGuilio, supra. See also Duley v. State, 56 Md. App. 275, 467 A.2d 776 (Ct.App. 1983) and State v. Durfee, 322 N.W.2d 778 (Minn.App. 1982).
In addition to her offender profile testimony, Dr. Goslin also testified, even more briefly,[11] as to certain "common denominators in the home environment" that "over the past 15 years" have come up "often enough in families where sexual abuse occurs to be highly significant." The primary characteristic she recounted was lack of privacy in the home. Other testimony, not objected to, revealed that in the home T.F. shared with appellant, her younger sister and Brenda Harrison, there were no interior doors of any kind. Moreover, there was no testimony that coverings of any kind protected bathroom users or bedroom occupants from even the casual scrutiny of other household members or visitors. As with the offender syndrome testimony, other than an objection during proffer of this testimony that it was "speculative", defense counsel thereafter made no motion to strike nor did counsel request a cautionary instruction as to the purpose for which such testimony could be received. Even assuming that appellant's counsel preserved his objection for appellate review and that this testimony was erroneously admitted, we do not find a predicate for holding the admission of such evidence to be reversible error for the same reasons ascribed above.
We conclude this analysis on a cautionary note directed to the trial bench and bar. We confess to mounting trepidation with respect to the use of some expert witnesses in criminal prosecutions. It must be remembered that the purpose of the expert witness, by whomever called, is to offer guidance to lay-jurors on matters beyond their understanding. It is not the role of expert witnesses to "fill in the gaps" when substantive evidence which should be offered on some disputed issue is lacking.
Appellant's conviction and sentence are AFFIRMED.
*1101 JOANOS, C.J., and BOOTH, NIMMONS and WIGGINTON, JJ., concur.
ERVIN, J., concurs in part and dissents in part with opinion with which ZEHMER, J., concurs and SMITH, J., concurs in part.
SMITH, J., concurs in part and dissents in part with opinion with which SHIVERS and KAHN, JJ., concur.
ZEHMER, J., concurs in part and dissents in part with opinion with which ERVIN, J., concurs.
BARFIELD, J., concurs with opinion.
WOLF, J., concurs with opinion with which KAHN, J., concurs, and ZEHMER, J., concurs in part.
KAHN, J., concurs with opinion. (Did not participate in Oral Argument).
ALLEN, J., recused.
ERVIN, Judge, concurring and dissenting.
I agree with Judge Miner's opinion in affirming all issues except those relating to 1) the trial court's error in allowing the jury to view videotaped testimony of the victim during its deliberations; and 2) its error in admitting expert testimony regarding profiles of child-abuse offenders and environments in which such offenders and their victims live. I also agree with his opinion in affirming the trial court's admission of out-of-court statements made by the victim to Dr. Penrod identifying her father as the perpetrator of the abuse on the ground that such statements are not hearsay because they were consistent with the witness's testimony and offered to rebut a charge of recent fabrication, Section 90.801(2)(b), Florida Statutes (1985). I disagree, however, with Judge Miner's alternative analysis on that issue, that such statements nonetheless properly fall within the medical diagnosis or treatment exception to the hearsay rule, Section 90.803(4), Florida Statutes (1985).
The remainder of this dissenting and concurring opinion will focus upon my areas of disagreement, beginning first with the statements made to Dr. Penrod, turning then to my dissenting views relating to the jury's access to the victim's videotaped testimony, and concluding with the profile testimony of Dr. Goslin.

I.

The trial court's admission of statements made by the child victim identifying her father as the person who abused her.
As to Judge Miner's conclusion that Dr. Penrod's testimony was otherwise admissible pursuant to the provisions of section 90.801(2)(b), the rule is clear that evidence inadmissible for one purpose under the hearsay rule may be admissible for another purpose. See State v. Allen, 519 So.2d 1076, 1078 (Fla. 1st DCA 1988); Lazarowicz v. State, 561 So.2d 392, 394 (Fla. 3d DCA 1990). As in Begley v. State, 483 So.2d 70 (Fla. 4th DCA 1986), the child's out-of-court statement to another person was properly admissible as a prior consistent statement that was made before the existence of a charge against her of recent fabrication.[12]Accord, Anderson v. State, *1102 574 So.2d 87 (Fla. 1991); McDonald v. State, 578 So.2d 371 (Fla. 1st DCA 1991). Therefore, I agree to affirm as to this issue for the limited reason stated. As previously noted, however, I disagree with Judge Miner's alternative conclusion, which holds that Dr. Penrod's account of what the child victim told him was admissible under the medical diagnosis and treatment exception to the hearsay rule.
In so saying, I think it essential to examine the manner in which the physician's question was directed to the victim. This question did not simply inquire about what happened to the child, but also called for identification of the father as the person who assaulted her. The question, "I understand you have had some problems with your father. What has happened with your father?" clearly implied the answer. (Emphasis added.) Even if such a leading question could generally be sanctioned by the medical diagnosis exception due to the tender years of the child, I am nonetheless of the view that statements regarding the accused's identity, as given in this case, are not appropriate exceptions to the hearsay rule, because they cannot be considered to have been elicited for the purpose of medical diagnosis or treatment, as required by the statute. Statements of fault not pertinent to treatment do not, according to pertinent Florida cases, qualify under this exception to the hearsay rule. See Torres-Arboledo v. State, 524 So.2d 403, 407 (Fla.) (statement made by victim of gunshot wound to physician while being attended in the emergency room, recounting that black men had tried to steal his medallion, was inadmissible under section 90.803(4), because it was not reasonably pertinent to medical treatment), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988); Kopko v. State, 577 So.2d 956, 960 n. 8 (Fla. 5th DCA 1991) (medical doctor's testimony relating to child victim's statement did not qualify under the medical diagnosis or treatment exception, because the examination conducted on the child was for no "purpose other than to find physical evidence corroborating the allegations of abuse."); Lazarowicz v. State, 561 So.2d 392, 394 (Fla. 3d DCA 1990) (statement made by victim of sexual abuse to nurse during examination was not admissible pursuant to section 90.803(4), because there was no showing that the statement was made, or that the victim knew the statement was being made, for the purpose of medical treatment); Bradley v. State, 546 So.2d 445, 447 (Fla. 1st DCA 1989) (on rehearing) (statement made by a fourteen-year-old victim, while being tested for pregnancy, to a clinic staff member that she had been raped was not admissible under section 90.803(4), because it was "not `reasonably pertinent' to the diagnosis of whether she was pregnant;" hence the statement was not deemed sufficiently trustworthy to fall within the hearsay exception); Hanson v. State, 508 So.2d 780, 781 (Fla. 4th DCA 1987) (trial court erred  although the error was harmless  in permitting attending physician of child sexual abuse victim to relate the name of the person who abused her); Saul v. John D. & Catherine T. MacArthur Found., 499 So.2d 917, 919-20 (Fla. 4th DCA 1986) (portion of doctor's notes, recounting that accident victim was injured due to a fall caused by catching the heel of her shoe in the carpet, was inadmissible because it was not relevant to treatment of her injuries).
In the instant case, I have the same difficulty, as was expressed by this court in Bradley, concerning the reliability of the victim's statement. Dr. Penrod, a pediatrician, and a member of the child protection team, testified that the purpose of his treatment was to conduct an examination *1103 of the child for possible sexual abuse. That the child was no doubt aware of this purpose is apparent from the sequence of events before her referral to him. After the initial report was made that the child had been abused, she was interviewed at a Wakulla County elementary school by a district intake counselor for HRS, where she was asked to demonstrate with anatomically correct dolls what had happened. The child thereafter was taken to Tallahassee, and the counselor conducted a videotaped interview. Shortly afterward she was examined by Dr. Penrod. I consider that, similar to the facts in Bradley, the primary purpose of the child's visit to the pediatrician was to substantiate the authorities' suspicion that the child had been sexually abused, and not for the purpose of receiving treatment for an assault or rape. Under the circumstances, the child's statements lacked the assurances of reliability necessary for their admission under the medical diagnosis exception to the hearsay rule.
I think it obvious from the above history that by the time the child arrived in Dr. Penrod's office, she was well aware of the purpose of the medical examination; moreover the way in which Dr. Penrod phrased his question to the child obviously prompted the anticipated answer. Under the circumstances, this is the type of response that is lacking in any indicia of reliability. As the United States Supreme Court observed, "`If there is evidence of prior interrogation, prompting, or manipulation by adults, spontaneity may be an inaccurate indicator of trustworthiness.'" Idaho v. Wright, ___ U.S. ___, ___, 110 S.Ct. 3139, 3152, 111 L.Ed.2d 638, 659-660 (1990) (quoting with approval State v. Robinson, 153 Ariz. 191, 201, 735 P.2d 801, 811 (1987)). Consequently, if an out-of-court statement fails to satisfy the essential requirement of trustworthiness, it must be considered inadmissible because exceptions to the hearsay rule presume inherent reliability.[13]See C. Ehrhardt, Florida Evidence § 803, at 467 (2d ed. 1984) (hereafter: Ehrhardt).
I am aware that there is a body of federal case law that places a less restrictive interpretation upon Federal Rule of Evidence 803(4), than that which Florida courts place on section 90.803(4), which was patterned after the federal rule. Nevertheless, the different interpretations, discussed infra, still do not in my judgment permit admission of the type of response the physician elicited in this case.
In United States v. Iron Shell, 633 F.2d 77 (8th Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981), the Eighth Circuit Court of Appeals held that the trial court properly admitted into evidence, pursuant to rule 803(4), hearsay statements given to an examining witness by a nine-year-old victim of a sexual assault. Specifically the court rejected the defense's argument that the questions and responses were not reasonably pertinent to diagnosis or treatment, as required by the rule, for the reason that the physician had obtained the hearsay responses from the victim in his role as an investigator trying to solve the crime, rather than as a physician treating or diagnosing a patient. In dismissing the defendant's distinction, the court cited 4 J. Weinstein & M. Berger, Weinstein's Evidence 803-125 (1979), relating to the types of statements admissible under rule 803(4), including: "(1) medical history, (2) past or present sensations, and (3) inception or general cause of the disease or injury." Iron Shell, 633 F.2d at 83. Noting Weinstein's comment that all three types are admissible if they are "reasonably *1104 pertinent to diagnosis or treatment,"[14] the court observed:
The rule changed prior law in two main points. First, the rule adopted an expansive approach by allowing statements concerning past symptoms and those which related to the cause of the injury. Second, the rule abolished the distinction between the doctor who is consulted for the purpose of treatment and an examination for the purpose of diagnosis only; the latter usually refers to a doctor who is consulted only in order to testify as a witness.

Id. (Emphasis added; footnote omitted).
Thus, as the Eighth Circuit pointed out, a statement relating to the inception or general cause of an injury is reasonably pertinent to diagnosis even when the hearsay statement is elicited by a physician acting in his capacity as a potential witness in a criminal case. The court concluded that the statements the medical doctor obtained relating to the cause of the injury were admissible in that the purpose of the examination was both to treat the victim and to preserve any available evidence. The court continued:
There is nothing in the content of the statements to suggest that [the declarant] was responding to the doctor's questions for any reason other than promoting treatment. It is important to note that the statements concern what happened rather than who assaulted her. The former in most cases is pertinent to diagnosis and treatment while the latter would seldom, if ever, be sufficiently related.
Id. at 84. (Emphasis added; footnote omitted.) In making the above distinction, the court relied upon the advisory committee notes to rule 803(4), which explain that a patient's statements relating to fault ordinarily do not qualify as a hearsay exception. For example: "a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." Id. at n. 10 (quoting Federal Rule of Evidence 803(4) advisory committee's note on proposed rules).
A later opinion of the Eighth Circuit Court of Appeals modified the dicta in Iron Shell, in which the court had stated that hearsay comments relating to the identity of persons who assault victims do not fall within the medical diagnosis exception. In United States v. Renville, 779 F.2d 430 (8th Cir.1985), the court approved the trial court's admission of certain out-of-court statements identifying the defendant as the abuser, which the victim had made to a physician during an examination. In so ruling, the Eighth Circuit observed that a statement by a child abuse victim identifying the abuser as a member of the victim's immediate household would be generally admissible, because such statements are the type that physicians reasonably rely upon in determining a diagnosis and course of treatment. Id. at 438. The court continued that ordinarily an individual who identifies the person responsible for his or her injuries does so without expecting the information to facilitate treatment. The general rule precluding the admission of such statements, however,
rests on the obvious assumption that the declarant is responding under the impression that he is being asked to make an accusation that is not relevant to the physician's diagnosis or treatment. This assumption does not hold where the physician makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding. In such circumstances, the victim's motivation to speak truthfully is the same as that which insures reliability when he recounts the chronology of events or details symptoms of somatic distress.
Id. The Renville court took care to explain, based on the facts before it, that before questioning the child, the physician had explained to her that his examination and questions were necessary to obtain information for treating her as well as to help her overcome any physical and emotional *1105 problems that the recurrent abuse may have caused. Id. at 438-39.
The Eighth Circuit's opinions in Iron Shell and Renville thus instruct that it is immaterial in what capacity a physician acts in obtaining statements from a person pursuant to rule 803(4), if such statements are elicited solely for the purpose of establishing the cause of the injury or condition. On the other hand, if the physician's questions relate to the identity of a person who caused the injury, it must clearly be shown that the physician elicited the information for treatment of the victim, whether by that physician or another.
Consequently, the important distinction between the facts at bar and those in Renville is that in Renville the examining physician was not investigating a crime as an agent for the state, but was treating the child's emotional and psychological scars which attended the crime. The victim's identification of the person who committed the offense was essential to her treatment. The physician therein stated:
[I]f we can get to these children early, if we can help them work though [sic] their problems, if we can help them learn to understand what has happened and why and that it is not their fault, they can then hopefully go on to live a fairly healthy life. But, as I said, if we don't get these children and we can't help them, most of them will grow up to be abusers themselves and/or end up with adolescent problems from truancy to breaking the law to sexual deviation on down the line and so it is extremely important for me from a medical point of view to gather as much of that knowledge that I can so that I can then hopefully direct her care down the line for treatment * * *.
Id. at 437 n. 12.
There is no similar testimony by Dr. Penrod in the present case explaining that his examination and questions of the child victim were necessary to obtain information for the purpose of treating her and helping her overcome any physical and emotional problems which may have accompanied the suspected sexual abuse. In fact, it appears from the record that the sole reason that Dr. Penrod interviewed the child was because he was a member of the child protection team, which made it his duty to detect possible sexual abuse, and it was necessary for him to take a history from the subject to facilitate any such determination. Dr. Penrod's role is evident from the following statutory provisions.
Chapter 415, Florida Statutes (1985), contains extensive provisions for the protection of children from physical abuse of the nature involved in this case. Section 415.502 sets forth the legislative intent as follows:
[T]o provide for comprehensive protective services for abused or neglected children found in the state by requiring that reports of each abused or neglected child be made to the Department of Health and Rehabilitative Services in an effort to prevent further harm to the child or any other children living in the home and to preserve the family life of the parents and children, to the maximum extent possible, by enhancing the parental capacity for adequate child care.
To accomplish these purposes, physicians who treat children for injuries and who know or have reasonable cause to suspect that child abuse has occurred are required, under penalty of criminal sanction, to report their knowledge or suspicion to the department so that it may investigate the circumstances and determine responsibility for such injuries and abuse. §§ 415.504,.513, Fla. Stat. (1985). To assist in this endeavor, the statute provides for use of a "child protection team," that is, "a team of professionals established by the department to receive referrals from the single intake and protective services staff of the children, youth, and families program and to provide specialized and supportive services to the program in processing child abuse and neglect cases." § 415.503(4), Fla. Stat. (1985). Section 415.5055 requires the department to set up child protection teams in each service district "to supplement the single intake and protective services activities" of the department's programs. Such teams are composed of "representatives *1106 of appropriate health, mental health, social service, legal service, and law enforcement agencies," and their role "shall be to support activities of the program and to provide services deemed by the teams to be necessary and appropriate to abused and neglected children upon referral." §§ 415.5055, .5055(1), Fla. Stat. (1985).
Section 415.5055 also sets forth an extensive list of the "specialized diagnostic assessment, evaluation, coordination, consultation, and other supportive services that a child protection team shall be capable of providing," such as "[m]edical diagnosis and evaluation services, including provision or interpretation of X rays and laboratory tests, and related services, as needed, and documentation of findings relative thereto"; "[m]edical evaluation related to abuse or neglect, as defined by department policy or rule"; and "[e]xpert medical, psychological, and related professional testimony in court cases." Id. at (1)(a), (c), (f).
Both section 415.507 and Florida Administrative Code Rule 10M-2.004 authorize medical examination of a child incident to a child abuse investigation with or without parental consent. The rule moreover provides that "[t]he physician from the multi-disciplinary Child Protection Team is the physician of choice unless getting the child to that physician presents an unnecessary burden[.]"
It becomes exceptionally important, when a physician is acting in the role of child protection team investigator, for the court to identify and differentiate between hearsay statements made to the physician for purposes of medical treatment and those made for investigative purposes in order to detect the identity of the individual responsible for the abusive injury. If hearsay statements are offered in evidence for purposes of medical treatment under section 90.803(4), the burden is upon the proponent to affirmatively establish on the record that such statements were in fact necessarily related to treatment as a predicate to admissibility. Begley v. State, 483 So.2d 70, 73-74 (Fla. 4th DCA 1986). Whether the hearsay statement is reasonably pertinent to treatment "is a preliminary question of fact for the trial judge to determine" from the record and "should be judged from the doctor's perspective." Ehrhardt § 803.4, at 482 (footnotes omitted). It is not enough, therefore, for the trial court, or an appellate court, to infer or speculate from an otherwise void record that such information appears to be reasonably necessary to medical treatment within the meaning of section 90.803(4). This is particularly true in situations in which information is being obtained in compliance with the statutory requirement to report or investigate child sexual abuse, because the purpose of the hearsay answer to the investigating doctor's question does not fit within the rationale for section 90.803(4).
Thus, in the instant case it was appropriate for Dr. Penrod, as a member of the child protection team, to ask the child how the injury occurred and, indeed, who caused it. But in so doing, Dr. Penrod was clearly acting as an agent of the state investigating potential criminal conduct, not as a physician soliciting history considered necessary for medical treatment. It is apparent from the record that Dr. Penrod testified as a state witness regarding his examination of the child as a team member to detect child sexual abuse, and that he was presented as an expert on such detection. The record shows indisputably that he was not questioned by the state or the defense about any treatment of the child. No doubt the issue of whether the victim may have been sexually abused would be pertinent to a treating doctor's diagnosis and treatment, but the assessment of fault and identification of the person who assaulted the child was not shown to be necessary to her medical treatment, and thus was inadmissible under section 90.803(4). See Torres-Arboledo v. State, 524 So.2d 403 (Fla.), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988).
In so deciding, I do not mean to suggest that a physician, simply due to his or her status as a member of the child protection team, is necessarily precluded from testifying to a statement which identifies a person as the perpetrator of abuse, when such statement is reasonably pertinent to diagnosis *1107 or treatment. Because the treatment furnished by the physician in the present case was only for the purpose of determining the possible existence of sexual abuse, I conclude that the statement, considering all the circumstances under which it was obtained, was inherently unreliable and therefore did not fall within the traditional parameters of the hearsay exception.

II.

The trial court's error in permitting the jury's apparent unsupervised viewing of the victim's videotaped testimony during its deliberations.
Although recognizing that a substantial body of out-of-state case law forbids a jury's unsupervised and unrestricted review of videotaped testimony during its deliberations, Judge Miner's opinion concludes that because there is nothing in the record showing that a request was actually made by the jury that the television equipment be placed in the jury during its deliberations, the defendant has failed in his burden of demonstrating prejudicial error. In my judgment, Judge Miner's opinion, under the circumstances, incorrectly places the burden on the defendant, rather than the state. The record discloses that after presentation of all the evidence, and over defense objection, the trial court ruled that the videotape might be made available to the jury during its deliberations because "[i]t was filed here and is an exhibit and not objected to. Therefore, admissible as such."[15] The record moreover shows that the state requested that video equipment be set up in the jury room, and that the judge indicated the equipment would be set up if the jurors so requested.
Although there is no actual indication regarding whether the jury later asked to view the videotape after it had begun its deliberation, I consider that the lower court erred in approving the jury's access to the videotaped testimony over defense counsel's objection to the submission of such evidence to the jury during its deliberation. Such testimony, taken before a trial pursuant to Section 92.53, Florida Statutes (1985), is essentially a deposition by visual electronic recording used to preserve the testimony of a child victim for presentation at trial. See Fla.R.Crim.P. 3.190(j). As such, it is excepted from the items of evidence a judge may permit the members of the jury to take with them to the jury room upon retiring for deliberation. Fla. R.Crim.P. 3.400(d). The purpose of this rule is patently obvious: It serves to prevent the jury during its deliberation from concentrating on and being unduly influenced or persuaded by the testimony of a particular witness when the testimony of the other witnesses is not also made available. In the trial below, the videotaped testimony of the child was critical to appellant's case, because appellant had disputed the truthfulness of the child's testimony, and because the child had recanted her testimony prior to trial. Consequently, had the videotape been viewed by the jury during its deliberation, reversible error would certainly exist.
When unauthorized materials are permitted to go to the jury while it is considering its verdict, a rebuttable presumption is placed on the state to show that no actual prejudice occurred. See State v. Hamilton, 574 So.2d 124 (Fla. 1991). In such instances, an evidentiary hearing regarding the unauthorized materials must be conducted, and "`defendants are entitled to a new trial unless it can be said that there is no reasonable possibility that the unauthorized [materials] affected the verdict.'" Id. at 129 (quoting Paz v. United States, 462 F.2d 740, 745 (5th Cir.1972)). Here, the state failed to meet its burden of showing that no prejudice occurred as a result of the erroneous ruling. Consequently, prejudicial error must be presumed. Hamilton.
If this were the only error before us, I would conclude that a correct resolution of the issue requires a remand of the case for the trial court to conduct an evidentiary hearing pursuant to the test approved in *1108 Hamilton. In that I consider, however, that the lower court erred in admitting Dr. Goslin's profile testimony, as discussed infra, I would reverse the conviction and remand the case for new trial.

III.

The trial court erred in admitting expert testimony relating to profiles of child sex abuse offenders and environments.
Dr. Goslin, a clinical psychologist employed by the child protection team, whose specialty is child and adolescent psychology, was permitted to testify over objection that persons who commit child sexual abuse have certain characteristics. She identified the first group as pedophiles, persons who find that only children are capable of satisfying their sexual needs. In the second group, composed of adult males living with families, the male, she stated, often has a passive personality as well as problems caused by such circumstances as unemployment or marital dissatisfaction, or he may be living in a situation conducive to child sexual abuse; for example, the mother works outside the home and the father or other adult male is at home with the children. The third group, with whom appellant was linked by subsequent testimony,[16] was described by Dr. Goslin as consisting of men who are domineering, authoritarian, and controlling, who are likely to view their wives and children as possessions whom they should be permitted to do with as they please.
Dr. Goslin was also allowed to testify about certain environmental factors that are common to households in which child sexual abuse occurs. For example, in homes where abusers and their victims live, there are often no doors on the bedrooms or bathrooms, thus the child is raised with no sense of privacy.
Dr. Goslin's testimony was first proffered outside the hearing of the jury. Defense counsel objected on the ground that the proffered testimony failed to meet the Frye[17] test of general acceptance by the scientific community in the particular field in which it belongs, as well as on the ground that the testimony was irrelevant. The court overruled the objection to the proffered profile testimony, subject to the condition that the evidence be connected by other testimony comparing the characteristics in the profile with the house in which the defendant and the child lived, and the type of personality manifested by the defendant.
Before proceeding to the question of whether Dr. Goslin's opinion testimony complied with the Frye general acceptance standard, I consider it essential to point out that Frye is now the preferred test in Florida for determining the admissibility of novel scientific techniques. Previously, some uncertainty had been expressed in a number of judicial opinions whether the Frye standard or the relevancy standard[18] is the appropriate gauge by which such novel scientific evidence is measured. See Lindabury v. Lindabury, 552 So.2d 1117, 1118 (Fla. 3d DCA 1989) (Jorgenson, J., dissenting) (post traumatic stress syndrome), cause dismissed, 560 So.2d 233 (Fla. 1990); Andrews v. State, 533 So.2d 841, 847 n. 6 (Fla. 5th DCA 1988) (genetic fingerprint evidence), review denied, 542 So.2d 1332 (Fla. 1989); Kruse v. State, 483 So.2d 1383, 1384-85 (Fla. 4th DCA 1986) *1109 (post traumatic stress syndrome suffered by child victim of sexual assault), cause dismissed, 507 So.2d 588 (Fla. 1987);[19]Brown v. State, 426 So.2d 76, 87-89 (Fla. 1st DCA 1983) (hypnotically refreshed testimony), disapproved of on other grounds, Bundy v. State, 471 So.2d 9 (Fla. 1985). Any doubts, however, regarding which of the two standards is preferred were laid to rest by the Florida Supreme Court's recent decision in Stokes v. State, 548 So.2d 188 (Fla. 1989), in which it applied Frye to the use of hypnotically refreshed evidence. Upon review of pertinent case law and scientific literature, the court decided that such evidence lacked general acceptance in the particular scientific community. Id. at 195. More recently the Second District applied the Frye rule to bar the testimony of a clinical psychologist relating to his use of a technique styled the "sexual abuse legitmacy scale" for the purpose of evaluating the report of a child victim that she had been sexually molested. Page v. Zordan, 564 So.2d 500, 502 (Fla. 2d DCA 1990). The court concluded that the test had neither been recognized nor accepted within the relevant scientific community.
Because Frye is now clearly the standard by which novel scientific techniques are tested in Florida, I think it should be next determined whether Dr. Goslin's opinion testimony, insofar as it referred to certain psychological profiles, necessarily falls into the category of a novel scientific technique which must be subjected to the strictures of Frye. Typically Frye has been applied to test the reliability of novel scientific physical procedures, such as hypnosis, liedetector examinations, voiceprint identification, etc. The more difficult question is whether it applies to novel psychological procedures. The answer to this question depends to a large extent upon the manner in which an expert phrases his or her opinion.
Most expert medical opinion testimony is not in fact subject to the Frye standard, such as, for example, a psychiatrist's opinion that a defendant is competent to stand trial. In People v. McDonald, 37 Cal.3d 351, 690 P.2d 709, 208 Cal. Rptr. 236 (1984), the California Supreme Court stated that the Kelly-Frye[20] test was inapplicable to both expert psychiatric opinion testimony and the testimony of an expert who provided generalized factual information. Concerning the expert's opinion testimony, the court reasoned that the purpose of imposing Kelly-Frye did not exist if the expert's opinion testimony could be considered personal opinion, because jurors are naturally more skeptical of an expert's opinion than they are of "scientific" devices, which exude an "aura of infallibility." Id. at 372-73, 690 P.2d at 724, 208 Cal. Rptr. at 251. In considering an expert's recitation of factual information  in McDonald the contents of eyewitness-identification studies reported in scientific literature  the court concluded that an expert's reference to factual *1110 information was not considered expert opinion which was beyond the common experience of the factfinder. Id. at 365-67, 690 P.2d at 719, 208 Cal. Rptr. at 246.
In so stating, however, the court did not disavow its decision of nearly six months before in People v. Bledsoe, 36 Cal.3d 236, 681 P.2d 291, 203 Cal. Rptr. 450 (1984), in which it concluded that the trial court had erred in permitting the prosecution to present evidence during its case-in-chief opining that a rape victim was suffering from rape trauma syndrome. The court determined that evidence of the syndrome, introduced for the purpose of establishing that a rape had in fact occurred, did not meet the Kelly-Frye general acceptance standard. The Bledsoe decision was in keeping with the following observations made in the court's earlier opinion in People v. Shirley, 31 Cal.3d 18, 51-54, 723 P.2d 1354, 1374-75, 181 Cal. Rptr. 243, 264, stay denied, 458 U.S. 1125, 103 S.Ct. 13, 73 L.Ed.2d 1400, cert. denied, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982):[21]
Nor are those techniques necessarily limited to manipulation of physical evidence: we do not doubt that if testimony based on a new scientific process operating on purely psychological evidence were to be offered in our courts, it would likewise be subjected to the Frye standard of admissibility... . [T]he rule serves its salutary purpose of preventing the jury from being misled by unproven and ultimately unsound scientific methods.
Id. at 53, 723 P.2d at 1374-75, 181 Cal. Rptr. at 264.
Thus, in their application of the Frye test, California courts frequently observe a distinction between pure opinion testimony, as in McDonald, and opinion testimony that is based upon a psychological profile or syndrome, as in Bledsoe. In the former situation Frye is not implicated, while in the latter it is. This distinction is well illustrated in Seering v. Department of Social Servs. of Cal., 194 Cal. App.3d 298, 239 Cal. Rptr. 422 (Ct.App. 1987), involving review of an order declaring a child dependent. During the proceeding an expert testified concerning two methods he used in forming his opinion that the child had been molested. First, he stated that her behavior was consistent with the child sexual abuse accommodation syndrome (CSAAS)[22]; second, he based his opinion on interviews he conducted with the child and his own experience with abused children. Id. at 312-13, 239 Cal. Rptr. at 431. The California Third District Court of Appeal held that testimony based upon the first method should have been excluded because the CSAAS was a new method of proof and was therefore subject to the Kelly-Frye standard, which it did not satisfy. As to the second method, the court found that the expert's statements that were based on interviews were his personal opinion and therefore were not subject to Frye. Id. at 313-14, 239 Cal. Rptr. at 431-32.
Similarly, in Glendening v. State, 536 So.2d 212, 220 (Fla. 1988), cert. denied, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989), the Florida Supreme Court held, without any discussion of the Frye standard, that one who qualifies as an expert in the area of interviewing children concerning sexual abuse could give an opinion during the prosecution's case-in-chief that the child victim had been sexually abused, but that the witness could not testify that it was the child's father who had committed the offense. Presumably, Frye was not *1111 discussed because the expert provided strictly personal opinion testimony.
Consistent with the case law discussed above, I am persuaded that Dr. Goslin's testimony cannot be classified as pure expert opinion testimony, which would thereby make it unnecessary for this court to decide whether her opinion need comply with Frye. This is because her testimony regarding general character traits of typical child sexual molesters, and the types of homes in which such molesters and their victims commonly live was based upon certain studies of child sexual abusers and their victims. Moreover, Dr. Goslin's profile testimony was offered for the apparent purpose of proving not only that the child victim had been sexually abused, but that the defendant was the abuser. I am therefore of the opinion that her testimony falls within the parameters of the rule stated in Bledsoe and its progeny, requiring that Frye be applied to novel syndrome evidence.
Given the intended effect of this evidence, I consider that Dr. Goslin's generalized profile testimony is quite similar to the expert opinion testimony recited in In re Sara M., 194 Cal. App.3d 585, 239 Cal. Rptr. 605 (Ct.App. 1987), in which the appellate court held that the lower tribunal erred in admitting expert testimony describing general characteristics common to victims of child molestation on the ground that such testimony, offered for the purpose of showing only that a child had been sexually abused, failed to meet the Kelly-Frye criteria. Id. at 592-94, 239 Cal. Rptr. at 610-11. Again, in People v. Bowker, 203 Cal. App.3d 385, 249 Cal. Rptr. 886 (Ct.App. 1988), the appellate court stated that the Kelly-Frye rule applies in cases in which an expert gives general testimony describing a syndrome in such a way that would allow the jury to apply the syndrome to the facts and conclude that the child was sexually abused.
My conclusion is further supported by this court's decision in Hawthorne v. State, 408 So.2d 801 (Fla. 1st DCA), review denied, 415 So.2d 1361 (Fla. 1982), in which we approved application of the Frye test to the battered-woman syndrome, raised by the defendant to support her theory of self-defense. There we stated that the trial judge should apply the following three-fold test to determine the admissibility of the syndrome evidence: 1) Whether the expert is qualified to give an opinion on the subject matter;[23] 2) whether the state of the art of scientific knowledge permits a reasonable opinion to be given by an expert; and 3) whether the subject matter of the expert opinion is so related to some science, profession, business, or occupation as to be beyond the understanding of the average lay person. Id. at 805.
Without deciding whether the clinical psychologist who testified in the case below was qualified to give an opinion,[24] and there is nothing in the record to show any lack of qualifications, and without deciding whether the subject matter of the expert opinion  the profile of a child sexual offender or victim  is so related to some science as to be beyond the understanding of the average lay person, I am of the view that the proponent of the proffered evidence, the prosecution, failed to meet the second Hawthorne criterion, requiring that the state of the art of scientific knowledge permits the expression of the opinion.[25] Consequently, it is immaterial pursuant to *1112 a Frye analysis whether, in the words of Judge Miner's opinion, the background information relating to the "offender profile syndrome" could "promote juror understanding of a phenomenon which is `not so understandable that people know as much about it as a qualified expert with the requisite skill and exposure to numerous studies in the field.'" Ante at 1099-1100 (quoting Ward v. State, 519 So.2d 1082, 1084 (Fla. 1st DCA 1988)). If, then, the profile or syndrome, which is the subject of the expert's testimony, has not been demonstrated by the proffering party to comply with the general acceptance standard, it may not be admitted, despite the fact that the technique may, as provided in Section 90.702, Florida Statutes (1985), otherwise assist the jury in understanding the evidence or deciding a fact in issue. See Ehrhardt, supra, § 702.2 at 400-401, and cases cited therein.
In determining whether the state of the art allows admission of a novel scientific technique, those courts that employ the Frye standard generally recognize three methods of proof for determining whether a particular scientific technique has attained general acceptance in the relevant scientific community: (1) expert testimony, (2) scientific and legal writings, and (3) judicial opinions. See Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum.L.Rev. 1197, 1215 (1980).
A typical application of these three methods is well illustrated in a recent opinion of the Utah Supreme Court, State v. Rimmasch, 775 P.2d 388 (Utah 1989), which held that the trial court erred in admitting certain testimony by the prosecution's expert witnesses which confirmed the child's version of the events. The experts constructed a psychological profile of a typical victim of child sexual abuse, and then compared the profile with the child's characteristics. Based upon this, they opined that the child was in fact a victim of abuse. Id. at 393-95. In concluding that such testimony was erroneously admitted, the supreme court initially stated that the admissibility of a new scientific technique could be established in two different ways: 1) by obtaining judicial notice of the inherent reliability of the evidence's foundational principles, or 2) by requesting that the trial court determine the inherent reliability of the principles based upon an evidentiary hearing. Id. at 398.
As to the first method, the court observed that a trial court could take judicial notice of scientific literature discussed in judicial decisions. Consequently, if a scientific principle has achieved sufficient reliability via judicial notice, there is no need to establish foundational evidence as to the validity of its basic principles. Id. On the other hand, if the reliability of the scientific principles and methods underlying the technique is not a fact of which a trial court is able to take judicial notice, it would then be necessary to determine whether the trial court admitted the evidence based upon a sufficient foundational or evidentiary showing. Id. In order to make such a foundational showing, the court continued, the evidence must demonstrate "the correctness of the scientific principles underlying the testimony, the accuracy and reliability of the techniques utilized in applying the principles to the subject matter before the court and ... the qualifications of those actually gathering the data and analyzing it." Id. at 403.
Based upon its notice of judicial decisions and scientific literature, as well as its examination of the record before it, the court concluded that profile testimony of children who have been sexually abused, which was then compared to the victim's characteristics, was inherently unreliable for the purpose for which it was offered: to prove the commission of the crime, and hence should have been excluded. Id. at 407.
Following the approach of both the Utah Supreme Court in Rimmasch and Florida courts in Stokes v. State, 548 So.2d 188 (Fla. 1989); Bundy v. State, 471 So.2d 9 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986); and Hawthorne v. State, 408 So.2d 801 (Fla. 1st DCA), review denied, 415 So.2d 1361 (Fla. 1982), I similarly find a lack of consensus in relevant judicial opinions to support a view that the profile of a typical child sexual *1113 molester is generally accepted in the relevant scientific community as a predictor of child sexual abuse. Accord United States v. St. Pierre, 812 F.2d 417, 420 (8th Cir.1987) (trial court properly refused to appoint expert to examine defendant for the purpose of determining whether he fit a sex-offender profile that was not generally accepted by scientific community); Haakanson v. State, 760 P.2d 1030, 1037 (Alaska Ct. App. 1988) (trial court erred in permitting prosecution to present evidence relating to certain characteristics common to child sexual abusers); People v. John W., 185 Cal. App.3d 801, 804-06, 229 Cal. Rptr. 783, 785 (Ct.App. 1986) (appellate court ruled inadmissible the testimony of defense expert who would have opined that he could find no evidence of deviant sexual interest of defendant based upon clinical interviews, the Minnesota Multiphasic Personality Inventory [MMPI], and penile plethsymograph, on the ground that the MMPI and plethsymograph were novel techniques and not generally accepted in the scientific community);[26]State v. Cavallo, 88 N.J. 508, 520-23, 443 A.2d 1020, 1025-29 (1982) (psychiatric testimony that defendant did not have character traits of a rapist not generally accepted as reliable in scientific community).
On the other hand, there appears to be a greater divergence of views among the courts regarding the admissibility of evidence relating to typical behavioral traits or characteristics among persons suspected of being the victims of sexual crimes. The cases in which the issue is addressed appear to be divided into two general groups. In the first, the courts usually disallow such profile or syndrome evidence if offered by the prosecution during its case-in-chief for a nonrehabilitative purpose, i.e., when submitted simply for the purpose of proving that the victim had been abused.[27]See, e.g., People v. Bledsoe, 36 Cal.3d 236, 681 P.2d 291, 203 Cal. Rptr. 450 (1984) (rape trauma syndrome); People v. Leon, 214 Cal. App.3d 925, 263 Cal. Rptr. 77 (Ct.App. 1989) (CSAAS); People v. Jeff, 204 Cal. App.3d 309, 251 Cal. Rptr. 135 (Ct.App. 1988) (child molest syndrome); Seering v. Department of Social Servs. of Cal., 194 Cal. App.3d 298, 239 Cal. Rptr. 422 (Ct.App. 1987) (CSAAS); In re Amber B., 191 Cal. App.3d 682, 236 Cal. Rptr. 623 (Ct.App. 1987) (use of anatomically correct dolls); State v. Black, 109 Wash.2d 336, 745 P.2d 12 (1987) (rape trauma syndrome); State v. Rimmasch, 775 P.2d 388 (Utah 1989) (psychological *1114 profile of typical child victim of sexual abuse).
If, however, the defense has attacked a witness's credibility, the courts often permit profile or syndrome evidence for the purpose only of rehabilitating the witness by showing that such apparently inconsistent conduct is in fact consistent with the syndrome or characteristics of a sexually assaulted victim.[28]See Bostic v. State, 772 P.2d 1089 (Alaska Ct. App. 1989) (minimalizing sexual abuse); People v. Gray, 187 Cal. App.3d 213, 231 Cal. Rptr. 658 (Ct.App. 1986) (reticence in disclosing incidents); People v. Dunnahoo, 152 Cal. App.3d 561, 199 Cal. Rptr. 796 (Ct.App. 1984) (delay in reporting crime), called into doubt on other grounds by, People v. Bravo, 219 Cal. App.3d 729, 268 Cal. Rptr. 486 (Ct.App. (1990); People v. Hampton, 746 P.2d 947 (Colo. 1987) (rape trauma syndrome admitted to explain adult rape victim's delay); State v. Spigarolo, 210 Conn. 359, 556 A.2d 112 (inconsistent and incomplete reports of incidents), cert. denied, 493 U.S. 933, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989); Wheat v. State, 527 A.2d 269 (Del. 1987) (delay and/or recantation); Simmons v. State, 504 N.E.2d 575 (Ind. 1987) (inconsistent versions of rape); State v. Davis, 422 N.W.2d 296 (Minn. Ct. App. 1988) (stealing and running away from home); State v. Bailey, 89 N.C. App. 212, 365 S.E.2d 651 (Ct.App. 1988) (child-victim's continued cooperation with abuser); State v. Middleton, 294 Or. 427, 657 P.2d 1215 (1983) (skipping school); State v. Hicks, 148 Vt. 459, 535 A.2d 776 (1987) (delay in reporting); State v. Robinson, 146 Wis.2d 315, 431 N.W.2d 165 (1988) (composure after assault). See also Note, Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses, 68 B.U.L.Rev. 155, 167-70 (1988).
In the case at bar, Dr. Goslin's testimony, as previously stated, was offered to support the prosecution's position that the victim had been sexually abused, which was obviously a nonrehabilitative purpose. As such, her testimony under the clear weight of judicial authority should not have been admitted because it did not comply with the Frye general acceptance standard.
Considering next the psychological literature,[29] I also find a lack of general consensus *1115 in the relevant community that Dr. Goslin's profile testimony is reliable for the purpose of establishing that a particular person was responsible for committing a crime. For example, one group of commentators has stated: "Nothing in the professional literature suggests that experts on child sexual abuse possess special knowledge or expertise that allows them to identify the perpetrator of sexual abuse." Myers, Bays, Becker, Berliner, Corwin & Seywitz, Expert Testimony in Child Sexual Abuse Litigation, 68 Neb.L.Rev. 1, 127 (1989) [hereafter Myers]. (Emphasis added.) Myers also points out
that sex offenders are a heterogeneous group with few shared characteristics apart from a predilection for deviant sexual behavior. Furthermore, there is no psychological test or device that reliably detects persons who have or will sexually abuse children. Thus, it is appropriate to conclude that under the current state of scientific knowledge, there is no profile of a "typical" child molester.
Id. at 142. A major difficulty with constructing profiles of the so-called typical child sexual molester is that "[w]hen working with individuals who deny deviant behavior ... [,] all available psychological tests are subject to `faking' and concealment. There is no psychological litmus test to detect sexual deviancy." Id. at 135.
Supporting these conclusions is the research of Levin and Stava relating to the Minnesota Multiphasic Personality Inventory [MMPI] in particular, a test commonly given to sex offenders. The authors reviewed thirty-six studies in which such offenders took the MMPI, and found methodological problems in most of the studies. They concluded that "in general, negative or inconsistent findings outweigh those of a positive nature." Levin & Stava, Personality Characteristics of Sex Offenders: A Review, 16 Archives Sexual Behav. 57 (1987).[30]
Another test frequently given sex offenders is the penile plethysmograph evaluation, in which the offender is presented deviant and non-deviant sexual stimuli and his erection response is monitored using a penile transducer. Researchers who conducted an extensive evaluation of this test by comparing results from offender groups and normal groups were of the opinion that "[t]he currently available evidence on validity and reliability does not provide strong support for the use of this procedure with populations where there are questions regarding whether the individual has engaged in deviant behavior." W. Murphy & H. Barbaree, Assessments of Sexual Offenders by Measures of Erectile Response: Psychometric Properties and Decision Making (manuscript prepared under contract with NIMH, Order No. 86MO506500501D).
There is, however, a greater divergence of views among researchers regarding whether it is possible to diagnose a child as having been sexually abused. Experts expressing the view that there are no typical symptoms of child sexual abuse include McCord, Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions: A Foray into the Admissibility of Novel Psychological Evidence, 77 J.Crim.L. & Criminology 1, 24-25 (1986); Melton & Limber, Psychologists' Involvement in Cases of Child Maltreatment: Limits of Role and Expertise, Am. Psychologist (in press); Golding, Mental Health Professionals and the Courts: The Ethics of Expertise, at 32 n. 8 (to be published *1116 in ___ Int.'l J.L. Psychiatry (1989) ("Currently, absent certain strong physical signs, e.g., presence of venereal disease or blatant vaginal or anal trauma, there are no scientifically acceptable scientific data on `sexual abuse profiles' based upon psychological data."); and Johnson, The Sexually Mistreated Child: Diagnostic Evaluation, 3 Child Abuse and Neglect 943, 947 (1979).
As Professor Myers pointed out, basing an opinion regarding abuse upon generalized symptoms is not logically supportable for the reason that
[t]he most casual examination of these symptoms reveals ... that many of them are associated with other developmental and psychological problems of childhood and adolescence. For example, the fact that a child suffers from nightmares, loss of appetite, regression, and depression says very little, if anything, about sexual abuse. A myriad of other factors can cause such symptoms, and it would be improper for an expert to base an opinion relating to sexual abuse on such ambiguous symptoms alone.
J. Myers, Child Witness Law and Practice § 4.15, at 157 (1987). Professor Myers' conclusion was echoed by the Utah Supreme Court which, based upon its survey of relevant scientific literature, noted that many scholars take the position that no uniformly identifiable psychological profiles apply to sexually abused children for two primary reasons: First, reactions to abuse may differ significantly among children, thus any "typicality" is difficult to determine; second, psychological characteristics that are commonly attributable to abuse may also be found in persons with any number of emotional problems unrelated to sexual abuse. State v. Rimmasch, 775 P.2d 388, 401 (Utah 1989).
On the other hand, a number of scholars accept the view that trained experts can detect symptoms and behaviors resulting from sexual abuse when evaluated within the context of a thorough examination. See, e.g., Guidelines for the Clinical Evaluation of Child and Adolescent Sexual Abuse, 27 J. Am. Acad. Child & Adolescent Psychiatry 655, 657 (1988); Sgroi, Porter & Blick, Validation of Child Sexual Abuse, in Handbook of Clinical Intervention in Child Sexual Abuse 39, 40-41 (S. Sgroi ed. 1982); J. Conte, E. Sorenson, L. Fogarty & J. Rosa, Evaluating Children's Reports of Sexual Abuse: Results From a Survey of Professionals (unpublished manuscript, available from J. Conte, Ph.D., School of Social Services Administration, University of Chicago, Chicago, Ill.); Faller, Criteria for Judging the Credibility of Children's Statements About Their Sexual Abuse, 67 Child Welfare 389, 391-92 (1988) ("Characteristics of the sexual victimization itself that indicate the allegation is true are the child's ability to describe specific sexual acts, an account of sexual behavior that is told from a child's viewpoint, and sexual knowledge in the child's statements or behavior that is beyond that expected for the child's developmental stage.")
However, even among those scholars who believe there are typical symptoms and behaviors that result from sexual abuse, there is a lack of consensus regarding the ability of an expert to determine whether a particular child with such traits or symptoms has in fact been abused. Perhaps even more pronounced is the lack of agreement among the experts as to the reliability of such profiles. Consequently, if Dr. Goslin intended in her testimony to construct some type of profile of a sexually abused child based upon the type of house in which the child lived, I have been unable to find any expert who would agree that this factor, taken by itself, is indicative of abuse. Perhaps it is a circumstance that may be considered with other attributes manifested by the suspected child victim as suggestive of sexual abuse, e.g., nightmares, loss of appetite, regression. But even if Dr. Goslin had referred to such additional factors, there is, as stated, no general consensus in the relevant scientific field that an expert could reliably give an opinion on the existence of sexual abuse based simply upon the presence of such symptoms in a child.
Having found no support for the profile constructed by Dr. Goslin in either pertinent case law or the scientific literature, I *1117 next consider the record before us as a means of determining whether there is any foundational support for the use of such evidence. The only attempt the state made to satisfy the Frye general acceptance standard is found in Dr. Goslin's response given outside the jury's presence to a question by the assistant state attorney regarding whether there was "any basis in fact" for her profile testimony:
[T]his is the kind of background information that is included in almost every study that we have of children who have been sexually abused, because a major part of the studies involves getting history and finding out what kind of home environment the child came from, what are the circumstances of the home, what were the specific characteristics of the home in order to be able to predict what homes are maybe at risk for such things to occur, so that we can provide some intervention. So, that is kind of a standard focus in most of the settings.
(Emphasis added.)
It should be apparent from this testimony that the profile Dr. Goslin referred to is used as a therapeutic tool for the purpose of evaluating whether a child suspected of having been sexually abused should be removed from the environment where the abuse may have occurred. This profile is used therefore for treatment, but not for determining whether an act of sexual abuse has occurred within the criminal context. This distinction is important because one of the major criticisms leveled against reliance on psychological profiles in cases involving sexually related offenses is that they have little, if any, relevant value in proving the commission of a crime. For example, in People v. Bledsoe, 36 Cal.3d 236, 681 P.2d 291, 203 Cal. Rptr. 450 (1984) (in bank), the California Supreme Court stated that the trial court had erred  although the error was harmless  in admitting a rape counselor's testimony relating to rape trauma syndrome (RTS) for the purpose of proving that a rape had occurred. Id. at 301. In so saying, the court made the following general observations:
Unlike fingerprints, blood tests, lie detector tests, voice-prints or the battered child syndrome, rape trauma syndrome was not devised to determine the "truth" or "accuracy" of a particular past event  i.e., whether, in fact, a rape in the legal sense occurred  but rather was developed by professional rape counselors as a therapeutic tool, to help identify, predict and treat emotional problems experienced by the counselors' clients or patients. As the professional literature makes clear  and as the expert testimony in this case also reveals  because in the past women who have brought charges of rape have traditionally had their credibility or motives questioned by the police and others, rape counselors are taught to make a conscious effort to avoid judging the credibility of their clients. As one expert in the field recently wrote: "When a woman seeks services from a psychologist, she wants and deserves help for her problems, not judgment. Judgment is appropriate for courtrooms, not for psychologists' offices... . When a psychologist becomes judgmental, he/she has become entrapped in a major pitfall. The victim is likely to view her disclosure behavior as having been punished, to discontinue treatment and to become reluctant to seek services in the future. The obvious way to avoid this pitfall is to remember that your role is to provide services to your client, not to make a judgment about whether a `real' rape occurred or about the victim's culpability."
Id. at 300 (emphasis omitted) (citing Kilpatrick, Rape Victims: Detection, Assessment and Treatment, Clinical Psychologist 92, 94 (1983)).
In deciding that expert testimony opining that a complaining witness suffered from RTS was not admissible to prove that the witness was in fact raped, because RTS was developed as a treatment device, the court nonetheless stated that its conclusion was not intended to suggest that RTS was not generally recognized or used in the relevant scientific community. Instead, the court emphasized that RTS was not employed in such community for the reason the prosecution sought to use it in that *1118 particular case: namely, to prove that "a rape in the legal sense had, in fact, occurred." Bledsoe, 36 Cal.3d at 248, 681 P.2d at 299, 203 Cal. Rptr. at 458.
In a very important caveat to its opinion, the court pointed out that even though RTS as proof of a crime failed the Kelly-Frye standard, evidence relating to the syndrome could nonetheless be admitted for the limited purpose of "disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." Id. at 247, 681 P.2d at 298, 203 Cal. Rptr. at 457. Thus, when a defendant has raised as a defense the fact that the victim's conduct is inconsistent with having been sexually assaulted  for example, the victim may have delayed in reporting the attack, or recanted  RTS evidence has been "introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault." Id.
The analysis the California Supreme Court used in Bledsoe was followed by the Third District Court of Appeal in People v. Bowker, 203 Cal. App.3d 385, 249 Cal. Rptr. 886 (Ct.App. 1988), as applied to CSAAS.[31] The Bowker court stated, following the dicta in Bledsoe, that although courts should reject the use of syndrome evidence as a predictor of the crime charged, nonetheless its use at a trial could be permitted pursuant to the following qualifications: "First[,] ... the evidence must be tailored to the purpose for which it is being received... . [A]t a minimum the evidence must be targeted to a specific `myth' or `misconception' suggested by the evidence." Id. at 393-94, 249 Cal. Rptr. at 891. Thus, if an alleged victim recanted his or her complaint, the expert, usually a psychologist or psychiatrist, could be permitted to testify that research shows that such behavior is not uncommon for an abused child who is seeking to remove himself or herself from the pressure created by police investigations in subsequent court proceedings. Id. at 394, 249 Cal. Rptr. at 891-92. The evidence, consequently, would be admissible only for the purpose of explaining to the jury that the child's apparent inconsistent conduct was nonetheless consistent with that of a sexually abused child.[32]Id.
The appellate court emphasized that before such evidence could be introduced for such limited purpose, the government should be required to identify the misconception which the evidence was designed to rebut. Furthermore, once it is identified, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true... . The evidence is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." Id. at 394, 249 Cal. Rptr. at 892.
In the case at bar, although Dr. Goslin's profile testimony referred to the types of environments in which child victims typically live, this portion of her testimony was not used, pursuant to the Bledsoe-Bowker dicta, to "disabus[e] the jury of some widely held misconceptions" concerning child abuse, but was submitted for the purpose of proving only that a crime had been committed. Obviously, the fact that a child lives in a home which has no barriers to ensure privacy is neither a typical symptom that follows a suspected incident of sexual *1119 child abuse, nor is it an attribute which would help rehabilitate the child's credibility. Assuming for the sake of argument that this is the type of home in which many abused children live, such information does not educate the jury about certain misconceptions the public may hold, nor does it rehabilitate the child once the child's credibility is at issue as a result of his or her apparent inconsistent conduct. Dr. Goslin's proffered profile testimony was offered simply to prove the commission of a crime, and, as such, it should have been declared inadmissible.
Moreover, Dr. Goslin did not testify about any studies comparing homes of children who were known to have been molested with homes of children who had not been molested. If such studies exist, they could conceivably qualify the profile as an accurate predictor of child sexual abuse. Cf. In re Sara M., 194 Cal. App.3d 585, 593, 239 Cal. Rptr. 605, 610-11 (Ct.App. 1987) (holding that Kelly-Frye precludes the introduction of generalized syndrome testimony during the state's case-in-chief for the purpose of demonstrating that the particular child had been abused, in that the experts "knew of no studies comparing the reactions of children known to be molested with those who claim to be molested or those who were not molested."); Seering v. Department of Social Servs. of Cal., 194 Cal. App.3d 298, 313, 239 Cal. Rptr. 422, 431-32 (Ct.App. 1987) (expert did not refer to any specific studies or publications demonstrating that CSAAS has been accepted in the relevant scientific community for the purpose of establishing the occurrence of sexual abuse).
Perhaps even more importantly, Dr. Goslin did not demonstrate any general consensus in the relevant scientific community either that a profile of a sexually abused child could be constructed from the fact that such persons often live in homes without adequate privacy, or that a profile of a child sexual offender could be developed from the fact that the adult male family members often have such vague and ambiguous characteristics as dominant, authoritarian, or controlling personalities.[33]Cf. Page v. Zordan, 564 So.2d 500, 502 (Fla. 2d DCA 1990).
Dr. Goslin's profile testimony as a predictor of sexual child abuse lacks any indicia of reliability for numerous other reasons. Nowhere in her testimony did she identify the profile or profiles to which she referred as being recognized by the American Psychological Association (APA), or other professional organization, nor did she state whether such profiles are included in the APA's Diagnostic and Statistical Manual. Cf. In re Sara M., 194 Cal. App.3d at 593, 239 Cal. Rptr. at 610. Wanting also was any statement regarding when or how long the profiles had been in use or how the profiles were developed. In my judgment, Dr. Goslin's profile testimony lacked any foundational support for use as a means of proving that the crime in question had been committed,[34] and therefore failed to have any evidentiary value for the jury.[35]
*1120 To summarize: The Frye standard now appears to be the appropriate test in Florida for determining the reliability of novel scientific techniques. Most expert opinion testimony is not of course subject to the Frye standard; however, an expert's psychological opinion that is based on a novel profile or syndrome which is the result of a particular study or studies must, in most jurisdictions that have adopted Frye, meet the general acceptance standard. Because Dr. Goslin's testimony relied on studies classifying certain attributes of child sexual molesters and victims of such abuse, the admissibility of such testimony required compliance with the Frye criteria. In applying the Frye test to the specific profile testimony admitted below, I am of the opinion, from my review of the pertinent case law and scientific literature, that there is no consensus in the relevant scientific community that a reliable profile of a typical sex offender can be used as a predictor of a criminal sexual offense.
There also appears to be a lack of agreement that a profile of a typical victim of child sexual abuse is reliable when offered by the prosecution for a nonrehabilitative purpose, i.e., for the purpose of proving that criminal child sexual abuse occurred. On the other hand, if the prosecution offers the evidence for the purpose of rehabilitating the victim of a sexual assault, e.g., after the defense has challenged the credibility of the victim regarding why he or she delayed in reporting abuse, or recanted an earlier report of abuse, the courts frequently, without discussion of the Frye general acceptance standard, permit the use of generalized syndrome or profile testimony, consistent with the Bledsoe-Bowker dicta. Because Dr. Goslin's opinion testimony did not fall within the latter category and was instead offered solely to support the prosecution's position that a criminal offense had occurred, I consider that her testimony was erroneously admitted due to its failure to pass the Frye test.

IV.

Conclusion
I therefore agree with Judge Miner's opinion in affirming the trial court's admission of similar-fact evidence, its denial of appellant's motion for mistrial, and its admission of Dr. Penrod's testimony recounting the child's statements identifying her father as the person who committed the offense charged, for the limited purpose of rebutting a charge against the child of recent fabrication. I disagree, however, with Judge Miner's conclusion that such statements were admissible under the medical diagnosis or treatment exception. I am also of the view that the lower court erred in giving the jury access to the child's videotaped testimony during its deliberations, and in admitting Dr. Goslin's expert testimony regarding the profiles of child sex abuse offenders and environments.
In so stating, I cannot conclude beyond a reasonable doubt, as required by State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), that the combined errors did not affect the verdict rendered; therefore, the harmless-error rule in my judgment is inapplicable. My conclusion in this regard is supported by the recent opinion of the United States Supreme Court in Yates v. Evatt, ___ U.S. ___, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), which articulated a procedure required for deciding whether the erroneous reception of evidence meets the harmless-beyond-a-reasonable-doubt standard announced in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In Yates, the Court explained that before a reviewing court can decide that an error did not contribute to the verdict rendered, it is necessary for the court to find that such error was unimportant in relation to everything else the jury considered as revealed in the record. Id. at ___, 111 S.Ct. at 1893, 114 L.Ed.2d at 448-49. To reach such a decision, a two-step analysis is required. The court must first ask what evidence the jury actually considered in reaching its verdict. In answering this question, the court may not conduct a subjective inquiry into the jurors' minds; rather, it must identify not only the facts subject to the error but also evidence of alternative facts sufficient to prove the elements of the crime, in accordance with the *1121 trial court's instructions. Id. The court must next weigh the probative force of the relevant, admissible evidence against the probative force of the erroneously admitted evidence standing alone. The decisive question then is whether the force of the evidence, presumably considered by the jury in accordance with the trial court's instructions, is so overwhelming as to establish beyond a reasonable doubt that the verdict based on that evidence would have been the same in the absence of the erroneous evidence. Id. at ___, 111 S.Ct. at 1893-94, 114 L.Ed.2d at 448-50.
In applying the two-step analysis of the Yates decision to the facts at bar, I do not see how it can be concluded beyond a reasonable doubt that the erroneously admitted profile testimony of Dr. Goslin did not contribute to the verdict obtained. The state's argument and the conclusion expressed in both Judge Miner's and the concurring opinions that the evidence of guilt was otherwise overwhelming are not, in my opinion, convincing. Much of the evidence the state presented related to statements, including the child's videotaped testimony, that the victim made to members of the child protection team or other persons. The core evidence of the defendant's culpability, however, came only from the victim and the defendant's girlfriend, and the credibility of these two witnesses could hardly be said to have been free from doubt. The child victim recanted her testimony after her initial report and accused the defendant's girlfriend of committing the acts of sexual abuse. The state, moreover, stipulated with the defense that the girlfriend had been extended an offer of leniency in exchange for her testimony, reducing the range of her exposure to prison for the crimes with which she was charged from twenty-two to twenty-seven years, to seven to nine years.
In my judgment it is no more possible to say in the instant case than it was possible for the Supreme Court in Yates to say that the force of the alternative evidence considered by the jury in accordance with the trial court's instructions was so overwhelming as to establish beyond a reasonable doubt that the verdict returned on such evidence would have been the same in the absence of the erroneously admitted profile testimony of Dr. Goslin. I therefore consider that appellant's conviction should be reversed and the case remanded for new trial.
ZEHMER, J., concurs and SMITH, J., concurs in part.
SMITH, Judge, concurring in part and dissenting in part.
I concur, with the exception herein noted, in Judge Miner's opinion affirming the judgment of conviction and sentence. I disagree with Judge Miner's and agree with that portion of Judge Ervin's dissent in which he finds error in the admission of Dr. Goslin's testimony concerning profiles of child sex abuse offenders and environments, for failure to satisfy the requirements of Frye v. United States, 293 F. 1013 (D.C.Civ. 1923). I agree with Judge Wolf, however (see Judge Wolf's specially concurring opinion) that the error in admission of this testimony was harmless under State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). I understand that the evidence was objected to below on the grounds of failure to meet the Frye test. Upon proper objection, the evidence in question would also be excludable under section 90.403, Florida Statutes (exclusion on grounds of prejudice or confusion), for the reasons stated by Judge Wolf.
SHIVERS and KAHN, JJ., concur.
ZEHMER, Judge, concurring part and dissenting in part.
I fully concur in Judge Ervin's opinion, and write only to briefly address certain points in Judge Miner's opinion.
Judge Miner's opinion correctly concludes that the testimony of Dr. Penrod concerning the victim's response to his question that identified the appellant as her sexual abuser was not hearsay in this instance under section 90.801(2)(b) of the Florida Evidence Code, and thus it was admissible on that basis. Appellant's counsel failed to request an instruction on the *1122 limited basis for so admitting this evidence, so it was thus admitted for all purposes.
However, Judge Miner's opinion errs in alternatively assuming that, even if Dr. Penrod's testimony were hearsay, it was nevertheless admissible under the medical diagnosis and treatment exception embodied in section 90.803(4) of the Florida Evidence Code. Judge Miner's opinion improperly provides an advisory opinion on the medical diagnosis and treatment exception because it is not based on facts shown in the record (appellate courts only decide the real dispute made by the actual facts before it) and should not be accorded any precedential value regarding application of this exception to the hearsay rule. Without trudging through the extensive discussion in the opinion of the diverse cases espousing differing views of the law in this area, it seems reasonably clear under Florida law that whether or not a physician's testimony is admissible under the medical diagnosis and treatment exception depends on a predicate showing that the physician's inquiry as to the abuser's identity and conduct toward the victim is necessary and essential to any medical diagnosis and treatment to be provided. E.g. Kopko v. State, 577 So.2d 956, 960 n. 8 (Fla. 5th DCA 1991); Danzy v. State, 553 So.2d 380 (Fla. 1st DCA 1989). Judge Miner's opinion does not recite, and there is not one word of evidence in the record to establish, that Dr. Penrod stated it was medically necessary to learn the identity of the alleged abuser in order to make any medical diagnosis or recommend any medical treatment. The record establishes only that the victim was taken to Dr. Penrod, a member of the child protection team, long after the alleged abusive acts occurred to determine by vaginal examination whether the child exhibited physical conditions indicating she had been subjected to sexual battery. There is not one word of testimony that the victim made any medical complaints to the doctor that would require him to perform a medical diagnosis or treatment of any medical complaints by the victim. Indeed, there simply is no evidence that the victim knew or expected that the doctor was going to provide medical diagnosis and treatment, although the patient's knowledge of this purpose is essential to the theoretical underpinning of the credibility of such statements that makes them admissible pursuant to this exception to the hearsay rule. Kopko v. State, 577 So.2d 956, 960; Bradley v. State, 546 So.2d 445 (Fla. 1st DCA 1989); Begley v. State, 483 So.2d 70 (Fla. 4th DCA 1986).[36] Because these essential facts are absent in this case, Judge Miner's opinion can only be treated as an attempt to establish a general rule of law that all statements by a child victim of sexual abuse made to an investigating medical physician concerning the identity and conduct of the abuser are admissible as a matter of law. In short, the discussion in Judge Miner's opinion of the medical exception is not necessary to resolve the issue presented on appeal, is not supported by the facts in this record, and is completely erroneous under the applicable law. There is no way on this record to reconcile it with this court's decision in Bradley or the fourth district's decision in Begley.
Finally, with regard to Dr. Goslin's testimony concerning certain psychological characteristics of child abusers, the so-called "profile evidence," it should be noted *1123 that her profile testimony was never connected to the appellant in any way either by her or by any other expert testimony, despite being admitted over appellant's objection based on lack of relevance. This fact alone leaves the evidence irrelevant to the issues of this defendant's guilt. I agree with Judge Ervin, for the reasons stated in his opinion, that appellant's alternative objection based on the Frye test was likewise well taken. I likewise agree with Judge Wolf's opinion that testimony of this nature is in all events inadmissible under sections 90.401, 90.403 and 90.404 of the Florida Evidence Code for the reasons he discusses, although it should be noted that this specific ground apparently was not presented to the trial court. However, I do not join Judge Wolf in treating this error as harmless. I agree that the error below was not harmless for the reasons stated by Judge Ervin. Applying the harmless error test announced in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, reh'g denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967), State v. Lee, 531 So.2d 133 (Fla. 1988), and State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), by subjecting the facts of this case to the extended harmless error analysis described by Justice Souter in Yates v. Evatt, ___ U.S. ___, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), I am unable to say beyond a reasonable doubt that such error did not contribute to the verdict obtained, that is, that there is no reasonable possibility that the evidence complained of might have contributed to the conviction.
I would reverse and remand for a new trial.
ERVIN, J., concurs.
BARFIELD, Judge, concurring.
I concur in the affirmance of the judgment and sentence. The trial judge committed error, but the error was harmless.
WOLF, Judge, concurring.
Testimony concerning the characteristics of persons who normally commit a particular type of crime is not admissible in a criminal proceeding.[37] The disputed evidence involves a psychological profile of sexual abusers.[38] This type of evidence must be excluded for several reasons: (1) It unfairly misdirects the focus of the criminal proceeding and is not relevant to the issues to be decided, section 90.401, Fla. Stat. (1989); (2) the probative value of this evidence is far outweighed by the prejudicial effect of the evidence, section 90.403, F.S. (1989); and (3) it is an indirect attempt to prove the guilt of an accused by demonstrating that he possesses a character trait that will cause him to act in conformity with that trait in a particular instance, section 90.404, F.S. (1989).
The purpose of a criminal proceeding is to determine whether a particular individual participated in a specific criminal episode. Evidence of the propensity of a particular group to commit a crime shifts the focus of the jury to the question of whether the accused is a member of the particular group. Evidence which would tend to allow a jury to determine guilt or innocence based upon group membership must be excluded. For instance, evidence that a particular racial or religious group is more likely to commit certain types of crimes would certainly be inadmissible. The disputed evidence is not material to the question of a defendant's guilt. § 90.401, Fla. Stat. (1989).
*1124 The Alaska Court of Appeals recognized that the prejudicial nature of such testimony clearly outweighs its probative value:
We are also concerned that a jury may place undue emphasis on sex offender profile testimony. Alaska Evidence Rule 403 provides for excluding relevant evidence if its "probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Other jurisdictions have found profile evidence introduced to establish that the defendant is a member of a particular group inadmissible on the basis that the prejudicial danger of such evidence outweighs any probative value it may have. The Maryland Court of Appeals, found that "[child batterer] profile evidence is highly prejudicial because it invites a jury to conclude that because an expert experienced in child abuse cases identifies an accused as someone fitting a particular profile, it is more likely than not that this individual committed the crime." Sloan v. State, 70 Md. App. 630, 522 A.2d 1364, 1368 (1987). Washington appellate courts have also held that evidence which identifies the defendant as a member of a group with a statistically higher incidence of child sexual abuse is inadmissible because of the high danger of prejudice. State v. Petrich, 101 Wash.2d 566, 683 P.2d 173, 180 (1984); State v. Claflin, [38 Wash. App. 847,] 690 P.2d 1186, 1190 (Wash. App. 1984); State v. Maule, 35 Wash. App. 287, 667 P.2d 96, 99 (1983).
Haakanson v. State, 760 P.2d 1030, 1036 (Alaska Ct. App. 1988). Since section 90.403, Florida Statutes, is similar to Alaska's provision related to prejudicial evidence, the analysis would be equally valid in Florida.
In addition, it is impermissible to present evidence of an individual accused's character or character trait to prove that the person acted in conformity with it on a particular occasion. § 90.404(1), Fla. Stat. (1989); Francis v. State, 512 So.2d 280 (Fla. 2nd DCA 1987); Erickson v. State, 565 So.2d 328 (Fla. 4th DCA 1990, rev. denied, 576 So.2d 286 (Fla. 1991). Evidence relating to characteristics of other people who generally commit a type of crime indirectly brings the accused's character into issue and has even less probative value than direct evidence of defendant's character. Thus, the evidence in question was inadmissible pursuant to section 90.403(1), Florida Statutes (1989).
Because of the highly prejudicial nature of the testimony in question, it is difficult to say beyond a reasonable doubt that the jury verdict was not influenced by the improperly admitted evidence. In light of the overwhelming evidence of guilt and the limited manner in which this evidence was utilized, however, I am willing to agree with the opinion authored by Judge Miner that the error was, in fact, harmless. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
In all other respects, I concur with Judge MINER's opinion.
KAHN, J., concurs, and ZEHMER, J., concurs in part.
KAHN, J., concurring.
I concur with the opinions expressed in the specially concurring opinions of Judge SMITH and Judge WOLF.

ON MOTION FOR REHEARING OR TO CERTIFY CONFLICT OR TO CERTIFY QUESTIONS
PER CURIAM.
Appellant has filed a motion for rehearing. In the alternative, appellant requests that we certify to the Florida Supreme Court that our decision in this case conflicts with decisions of the Florida Supreme Court or other District Courts of Appeal. Finally, appellant requests that we certify a number of different questions to the Supreme Court as ones of great public importance.
We deny appellant's motions for rehearing and request to certify conflict. We grant in part appellant's motion to certify questions and hereby certify to the Florida Supreme Court the following questions to be questions of great public importance:
1) Is expert scientific testimony which does not meet the test of Frye v. United *1125 States, 293 F. 1013 (D.C. Cir.1923) for admissibility of novel scientific evidence otherwise admissible as background information in a criminal trial?
2) Is Pedophile/child sex offender profile evidence admissible in a criminal trial?
The motion is denied as to all other questions suggested by appellant.
JOANOS, C.J., and BOOTH, WIGGINTON, BARFIELD, MINER and KAHN, JJ., concur in the denial of rehearing and the request to certify conflict.
ERVIN, SMITH, SHIVERS, ZEHMER and WOLF, JJ., dissent.
JOANOS, C.J., and ERVIN, SMITH, SHIVERS, ZEHMER, WOLF and KAHN, JJ., concur in the certification of the questions as ones of great public importance.
BOOTH, WIGGINTON, BARFIELD and MINER, JJ., dissent.
JOANOS, C.J., and BOOTH, SMITH, SHIVERS, WIGGINTON, BARFIELD, MINER, WOLF and KAHN, JJ., concur in the decision to deny certification of additional questions.
ERVIN and ZEHMER, JJ., dissent.
ALLEN, J., did not participate.
NOTES
[1] As part of a plea bargain, Brenda Hartley Harrison entered pleas of no contest to six felony counts arising out of her role in appellant's sexual abuse of T.F. She also agreed to testify against him. Under the plea agreement, she reduced her prison exposure from over 20 years to 7 to 9 years.
[2] This videotape was later admitted into evidence and shown to the jury over defense objection that T.F. was not a competent witness and that showing the tape violated defendant's confrontation clause rights.
[3] Using Brenda's name and Social Security number was apparently not his only effort to shed his true identity. According to Brenda, to assist appellant in acquiring a new identity, she drove him to a cemetery near Anthony in rural Marion County to examine tombstones in search of the name of a deceased person roughly his age, in whose name he could apply for a new Social Security number.
[4] After presentation of all the evidence and over defense objection, the trial court ruled that the videotape might be made available to the jury because "[i]t was filed here and is an exhibit and not objected to. Therefore, admissible as such." It is unclear in the record whether the cassette was actually taken into the jury room or not. Also, the record affirmatively indicates that, contrary to the trial court's observation, defense counsel did, in fact, object to the tape going into the jury room.
[5] Although not addressed by counsel below or in the instant appeal, we must necessarily deal with this question if we are to decide the issue raised by appellant.
[6] Both John Harper and Deborah Thibos testified at trial, without objection, that T.F. named appellant as her sexual abuser.
[7] At appellant's request, the trial court ordered Dr. Goslin to do a follow-up evaluation of T.F. This evaluation took place some seven months after Dr. Goslin first interviewed the child. Dr. Goslin testified that when T.F. was brought back to her office and without telling her why she was there, she (Dr. Goslin) innocuously inquired of the child, "What's happening with you?" and T.F. responded spontaneously, "I'm going to court next week to say that Brenda did it." We note that T.F. was then residing with appellant's parents and had been living with them since shortly after her first interview with Dr. Goslin.
[8] Section 90.803(4), Florida Statutes (1989), provides: "Statements made for purposes of medical diagnosis or treatment by a person seeking the diagnosis or treatment, or made by an individual who has knowledge of the facts and is legally responsible for the person who is unable to communicate the facts, which statements describe medical history, past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to diagnosis or treatment."
[9] Even as she argued for application of the minority view, counsel for appellant candidly acknowledged that the position we express on this issue accords with the holdings in the majority of jurisdictions where the question has arisen.
[10] All right. Now, that's not to say that any time you see one of those last two persons out of work or a person who is dominant, that that person is necessarily a child abuser?
A. Not at all, not at all.
[11] This testimony consumed 1 page of the 46 page record of Dr. Goslin's testimony.
[12] The existence in the present case of the victim's prior inconsistent statement is a primary distinguishing fact from those recited in Reyes v. State, 580 So.2d 309 (Fla. 3d DCA 1991); Kopko v. State, 577 So.2d 956 (Fla. 5th DCA 1991); and Lazarowicz v. State, 561 So.2d 392 (Fla. 3d DCA 1990). In each of those cases a "parade of witnesses" was allowed to testify as to previous statements of the child victims, which were consistent with the victims' testimony at trial, and the appellate courts reversed the defendants' convictions on the theory that such hearsay testimony tended to give credence to the victims' testimony, when determination of the victims' credibility was a critical jury function. We have a similar "parade" in the case at bar, and the testimony of the witnesses recounting the victim's statements identifying her father as the perpetrator of the abuse had the obvious effect of bolstering the victim's credibility. Nevertheless, because the victim below had made a pretrial statement that was inconsistent with her earlier statement implicating the defendant, I am of the view that the statement given to Dr. Penrod must, pursuant to section 90.801(2)(b), be considered nonhearsay. This is because the statement is simply proof of the fact that the victim made a statement which was consistent with a prior statement. It is not admissible as proof of the fact stated, and a cautionary instruction to that effect should, on timely request, be given to the jury. The facts at bar, moreover, are altogether dissimilar from those in Wise v. State, 546 So.2d 1068 (Fla. 2d DCA), review denied, 554 So.2d 1169 (Fla. 1989), in which an adult witness was first permitted to testify regarding a prior consistent statement made by a child victim before the defense had made an attempt to impeach the victim by a charge against her of false motive or recent fabrication. In the present case, Dr. Penrod testified immediately after the victim had given testimony which was subjected to cross-examination disclosing her prior inconsistent statements. Although it is true that the child's statements were repeated through the testimony of two other state witnesses before the child testified, the witnesses' testimony was not objected to and no point has been raised regarding any error in the reception of this evidence.
[13] This distinction does not appear to have been made by the Third District in State v. Ochoa, 576 So.2d 854 (Fla. 3d DCA 1991), when it reversed an order dismissing charges against the defendant of sexual battery and lewd assault on the ground that the statements the minor victims made to a physician were inadmissible under the medical diagnosis exception. In reversing, the Third District concluded that no showing need be made that the statements were reliable, because, in that they were made pursuant to a "firmly rooted" exception, reliability could be inferred without more. From the survey of Florida cases previously cited in this dissent relating to whether a particular statement qualifies under the medical diagnosis exception, I consider that a firmly rooted exception creates only a rebuttable presumption of trustworthiness which may be rebutted by evidence to the contrary.
[14] Fed.R.Evid. 803(4).
[15] As reflected in the majority's opinion, defense counsel did object to the tape's submission to the jury.
[16] Dr. Goslin herself did not offer any specific opinion whether appellant fell into any of the three classifications of deviant sexual behavior. If Dr. Goslin had so testified, I consider that such testimony would probably have been ruled inadmissible. See Erickson v. State, 565 So.2d 328 (Fla. 4th DCA 1990), review denied, 576 So.2d 286 (Fla. 1991).
[17] Frye v. United States, 293 F. 1013 (D.C. Cir.1923).
[18] Under the relevancy approach, a lack of general acceptance in the field in which the novel technique belongs would not necessarily bar the technique's admissibility. Such a factor might, however, be a consideration in determining the relevance of the proffered evidence. See Brown v. State, 426 So.2d 76, 88-89 (Fla. 1st DCA 1983), disapproved of on other grounds, Bundy v. State, 471 So.2d 9 (Fla. 1985). Pursuant to Frye, if the technique is otherwise shown to be relevant, but its proponent fails to show that it is generally accepted by the pertinent scientific community, the evidence may for that reason alone be excluded. Id.
[19] Because I consider that novel psychological syndrome or profile evidence, when offered by the prosecution for a nonrehabilitative purpose, to be discussed at length infra, cannot survive a Frye analysis, Kruse, which held syndrome evidence admissible under the relevancy approach, may have to be reevaluated. It appears from the Fourth District's discussion of the facts in Kruse that the prosecution offered such evidence solely for a nonrehabilitative purpose. Additionally, I am not unaware that this court in Ward v. State, 519 So.2d 1082 (Fla. 1st DCA 1988), which relied on Kruse, held there to be no error in the admission of an expert's opinion classifying certain types of characteristics or symptoms typically displayed by children who have been abused. It is unclear from a reading of the Ward opinion whether such evidence was offered as substantive proof of guilt, or as a means of rehabilitating the child, once the child's credibility had come under attack. If the expert's opinion there was offered for the latter purpose, the Ward decision approving it would be consistent with case law from other jurisdictions. See infra. At any event, the facts in Ward are distinguishable from those in the present case, in that here Dr. Goslin's testimony did not pertain to general symptoms of sexually abused children, but related to characteristics of typical child molesters and the environments in which they and their victims live.
[20] Since 1976, the year People v. Kelly, 17 Cal.3d 24, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976), was decided in which the court applied Frye to voiceprint identification evidence, California courts have commonly referred to the test as Kelly-Frye. L. Carter, Admissibility of Expert Testimony in Child Sexual Abuse Cases in California: Retire Kelly-Frye and Return to a Traditional Analysis, 22 Loy.L.A.L.Rev. 1103, 1107 (1989).
[21] The Florida Supreme Court extensively relied upon Shirley in Stokes v. State, 548 So.2d 188 (Fla. 1989), and Bundy v. State, 471 So.2d 9 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986), in reaching its decision that hypnotically refreshed testimony did not meet the Frye general acceptance standard.
[22] CSAAS was first described in a 1983 article by Dr. Ronald Summit, listing five general attributes of child sexual victims (secrecy, helplessness, denial, delayed disclosure, and retraction), whom he had treated over a substantial period of time. Summit, The Child Sexual Abuse Accommodation Syndrome, 7 Int'l. J. of Child Abuse & Neglect 177 (1983). CSAAS as a means of predicting sexual abuse has been the subject of considerable criticism because the syndrome assumes the existence of abuse, and was not developed as a method of detecting abuse. See In re Sara M., 194 Cal. App.3d 585, 593, 239 Cal. Rptr. 605, 611 (Ct.App. 1987); People v. Gray, 187 Cal. App.3d 213, 217-18, 231 Cal. Rptr. 658, 660-61 (Ct.App. 1987).
[23] If the witness is not qualified as an expert in the relevant field to which the person's opinion is directed, he or she should not be permitted to express an opinion. See Haakanson v. State, 760 P.2d 1030, 1037 (Alaska Ct. App. 1988) (state trooper not qualified to give testimony regarding a child sex offender profile because he was not a member of a relevant group of experts in the mental health field).
[24] No objection was in fact raised regarding Dr. Goslin's qualifications as an expert.
[25] Under Frye, it is not enough that the expert be qualified to give an opinion. The proponent of the evidence must demonstrate that the underlying principles and techniques on which the expert's opinion testimony is grounded are reliable. See State v. Rimmasch, 775 P.2d 388, 398 (Utah 1989). This approach appears to be altogether consistent with Section 90.704, Florida Statutes (1985), permitting an expert to give an opinion based upon facts or data "of a type reasonably relied upon by experts in the subject to support the opinions expressed."
[26] But see People v. Stoll, 49 Cal.3d 1136, 783 P.2d 698, 265 Cal. Rptr. 111 (1989), in which the California Supreme Court held that the trial court had erroneously barred admission of results of the MMPI, offered by the defendant, which would have aided her defense by presenting evidence excluding her from a class of sexual deviant offenders. The court reasoned that the test was not a novel technique, but was admissible character evidence. The supreme court moreover interpreted the appellate court's decision in John W. as applying Frye only to the penile plethysmograth test and not to the MMPI, because the expert testified that he did not rely upon the latter in forming his opinion. Id. at 1159 n. 21, 783 P.2d at 713 n. 21, 265 Cal. Rptr. at 126 n. 21. At any event, the facts in Stoll are distinguishable from those at bar because the expert in Stoll had indicated that "no psychological `profile' entered into his diagnosis." Id. at 1153, 265 Cal. Rptr. at 121, 783 P.2d at 708. See also People v. Ruiz, 222 Cal. App.3d 1241, 1245, 272 Cal. Rptr. 368, 371 (Ct.App. 1990) ("Stoll does not hold that such `profile' evidence is admissible.").
[27] In so holding, those courts applying the Frye standard may to some extent have been influenced by the rule prohibiting the introduction of character evidence during the prosecution's case on the ground that such evidence represents an impermissible attack on a defendant's character before the defendant has made it an issue. See E. Cleary, McCormick on Evidence § 206(D) (3d ed. 1984 & Supp. 1987). See also Erickson v. State, 565 So.2d 328 (Fla. 4th DCA 1990) (trial court erred in admitting testimony during state's case-in-chief in which psychiatrist had opined that defendant was a pedophile, because its sole purpose was to show defendant's bad character or propensity to commit the crime charged), review denied, 576 So.2d 286 (Fla. 1991); Francis v. State, 512 So.2d 280 (Fla. 2d DCA 1987) (error to allow state's expert witness to opine that defendant had personality characteristic of being attracted to children, because such character evidence was violative of Section 90.404(1)(a), Florida Statutes (1983), precluding the admission of such evidence unless offered by the accused, or by the prosecution to rebut the trait); Annotation, Admissibility of Expert Testimony as to Criminal Defendant's Propensity Toward Sexual Deviation, 42 A.L.R. 4th 937, 952-956 (1985 & Supp. 1989).
[28] California courts permit rehabilitation of the victim's credibility during various stages of the proceeding, and usually limit discussion of rehabilitation to victims as a class and not as to the particular victim. See People v. Roscoe, 168 Cal. App.3d 1093, 1099-1101, 215 Cal. Rptr. 45, 50 (Ct.App. 1985); People v. Harlan, 222 Cal. App.3d 439, 271 Cal. Rptr. 653 (Ct.App. 1990). For example, if the victim is impeached during the defense's cross-examination by showing that the victim's conduct was inconsistent with abuse, the state would then have the opportunity to rehabilitate the witness on re-direct or show the victim's conduct was consistent with the attributes of a syndrome. Carter, Admissibility of Expert Testimony in Child Sexual Abuse Cases in California: Retire Kelly-Frye and Return to a Traditional Analysis, 22 Loy.L.A.L.Rev. 1103, 1128 n. 177 (1989). The admission of such evidence for the limited purpose of rehabilitating the victim, once he or she has come under attack due to a charge of inconsistent conduct, appears to be an extension of the Evidence Code's approval of the admission of prior consistent statements once a witness has been charged with recent fabrication. See section 90.801(2)(b) and discussion supra.
[29] Although appellate courts applying the Frye standard typically recite relevant scientific literature in their opinions when determining the reliability of the particular scientific technique at issue, see Stokes v. State, 548 So.2d 188 (Fla. 1989), the party seeking admission of the scientific technique at the trial stage is precluded by Section 90.706, Florida Statutes, from offering statements from learned treatises as substantive evidence, although such writings may be used during cross-examination of the expert if the expert recognizes the material as authoritative. This, in my judgment, is an anomalous result. The proponent of the evidence, here the state, is required to establish the reliability of the novel scientific technique, but is not required, if indeed the expert relies on a treatise or other publication during his or her direct testimony, to disclose this material if it serves as an underlying basis for the opinion. A defense attorney may frequently be at a disadvantage in cross-examining the witness by use of such material, because access to the same may be difficult. As certain commentators have observed: "Lawyers are usually ill-equipped to perform such research, and, in most cases, the witness who testifies regarding general acceptance performs this task." Myers, Bays, Becker, Berliner, Corwin & Seywitz, Expert Testimony in Child Sexual Abuse Litigation, 68 Neb.L.Rev. 1, 127 (1989). In making the above statement, the authors apparently assumed that the proponent who relies upon such literature would offer it as substantive evidence as part of its case-in-chief, as is typically done in the federal courts pursuant to Federal Rule of Evidence 803(18), permitting the use of such material as an exception to the hearsay rule.
[30] Nonetheless, the California Supreme Court in People v. Stoll, 49 Cal.3d 1136, 783 P.2d 698, 265 Cal. Rptr. 111 (1989), recently held that opinion testimony interpreting the test results of the MMPI should have been admitted into evidence on behalf of a defendant for the purpose of excluding her from the relevant class of offenders. See supra note 26, at 68. It is questionable whether the Stoll rule is applicable in Florida. For example, an attempt to admit expert testimony offered by the defendant which would show that the defendant did not fit the profile of a pedophile was disallowed because the court considered that section 90.405, pertaining to the methods of proving character, did not permit evidence of character to be established by opinion testimony. See Wyatt v. State, 578 So.2d 811 (Fla. 3d DCA 1991).
[31] The court in Bowker  as had the Bledsoe court  held the erroneous reception of CSAAS harmless, due to the overwhelming nature of the evidence otherwise admitted.
[32] None of the courts that permitted admission of such testimony for rehabilitation purposes discussed whether such expert testimony complies with the Frye general acceptance standard. Nevertheless, as one commentator explains: "There probably is general acceptance of CSAAS or of its typical characteristics for the purpose of explaining a child's delay in reporting or retracting." Carter, Admissibility of Expert Testimony in Child Sexual Abuse Cases in California: Retire Kelly-Frye and Return to a Traditional Analysis, 22 Loy.L.A.L.Rev. 1103, 1133 (1989). In other words, the relevant scientific community would probably agree that a particular child's conduct is consistent with characteristics common to the syndrome, but would not agree that such traits are necessarily predictive of sexual abuse.
[33] Underscoring the equivocal nature of Dr. Goslin's opinion testimony was her admission that although there were three general classifications of child sexual offenders, "people [nonetheless] fall in between to some degree, too. But, those are the kind of overall stereotype, if you want to say, of the family types."
[34] For an excellent list of questions raised by the psychological community regarding the reliability of child molest syndrome, see State v. Schimpf, 782 S.W.2d 186, 194-195 (Tenn. Ct. App. 1989).
[35] The requirement that there be a careful evaluation regarding whether a particular child is the victim of sexual abuse was well stated by one expert in the following terms:

Determining whether a child has been sexually abused is a matter of great importance. If this judgment is wrong, a child's physical and emotional health may be permanently jeopardized, additional children needlessly abused and their families and communities traumatized. Just as important, an individual's reputation, access to and custody of children, and even liberty, may be lost over a false accusation. Children's recovery from the effects of abuse, the protection of the community and the protection of innocent persons depends on accurate decision making.
Berliner, Deciding Whether a Child Has Been Sexually Abused, Sexual Abuse Allegations in Custody and Visitation Cases (B. Nicholson & J. Bulkley eds. 1988) (emphasis added).
[36] The attempt in Judge Miner's opinion to distinguish this court's decision in Bradley v. State, 546 So.2d 445 (Fla. 1st DCA 1989), on grounds that "in the present case, the victim visited Dr. Penrod as a direct result of appellant's sexual assault on her" is simply not supported by the facts in this record. Moreover, Judge Miner's opinion does not discuss Begley v. State, in which the court described the state's failure to lay the required predicate as follows:

While statements admissible under this exception need not be made to a physician, there must be a showing (a) that the statements were made for the purposes of diagnosis or treatment, and (b) that the individual making the statements knew the statements were being made for this purpose. The record is devoid of any such showing. The state failed to lay a predicate for the admission of the statements under the medical diagnosis or treatment exception to the hearsay rule.
483 So.2d at 73-74. The key element of this exception is that the patient's or victim's statement was made to the physician under circumstances that indicate the patient had a self-interest motive to tell the truth to the physician.
[37] At trial, the defense objected that the evidence was irrelevant, immaterial, and failed to meet the test set out in Frye v. United States, 293 F. 1013 (D.C. Cir.1923), for admissibility of scientific evidence (general acceptance within scientific community). On appeal, they basically make the same arguments. While there was no specific objection on grounds that the probative value is outweighed by the prejudice, I believe that this objection is encompassed in the instant case in the argument that the evidence was not material.
[38] It is unnecessary to determine whether the evidence of psychological profiles of sexual abusers complies with Frye because the evidence in the instant case would be inadmissible under §§ 90.401-90.404, Fla. Stat., even if it met the Frye standard. It should also be noted that the inquiry and analysis in this case is inapplicable to psychological profiles presented to support the credibility of witnesses other than the accused.